# EXHIBIT L

Robert W. Norman (SBN 025328)
bnorman@houser-law.com
Solomon S. Krotzer (SBN 027985)
skrotzer@houser-law.com
HOUSER & ALLISON
A Professional Corporation
2929 N. Central Avenue, Suite 1560
Phoenix, Arizona 85012
Ph: (480) 428-8370
Fax: (480) 428-8371

Attorneys for Defendant Mountain America Federal Credit Union

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF ARIZONA

| | |
|---|---|
| Tyler Cook,<br><br>     Plaintiff,<br><br>vs.<br><br>Mountain America Federal Credit Union;<br>Experian Information Solutions, Inc.; Equifax<br>Information Services, LLC; and TransUnion,<br>LLC,<br><br>     Defendants. | Case No. 2:18-cv-01548-HRH<br><br>Honorable H. Russel Holland<br><br>**DEFENDANT MOUNTAIN AMERICA FEDERAL CREDIT UNION'S RULE 26(A)(2) EXPERT DISCLOSURE AND REPORT** |

Pursuant to Federal Rule of Civil Procedure 26(a)(2), Defendant Mount America Federal Credit Union hereby provides the following expert disclosure and report, which includes:

- Expert Report of John Ulzheimer's
- Exhibit A - John Ulzheimer's CV
- Exhibit B - John Ulzheimer's Expert Testimony in the Last Four Years
- Exhibit C - John Ulzheimer's Documents Review

Dated: March 8, 2019                    HOUSER & ALLISON,
                                        A Professional Corporation

                                        /s/ Solomon S. Krotzer
                                        Robert W. Norman
                                        Solomon S. Krotzer
                                        Attorneys for Defendant Mountain
                                        America Federal Credit Union

# Expert Report of John Ulzheimer

### In re: Cook v. Mountain America Credit Union

**March 8, 2019**

# I.    QUALIFICATIONS

### A.    Employment History

I have worked in the consumer credit industry since November of 1991. I spent six years with Equifax Credit Information Services and spent several of those years both performing the consumer dispute process and managing a team of consumer service agents that also performed the consumer dispute process, including disputes related to identity theft and fraud. My team and I also handled the process of generating the appropriate dispute forms, manual verification, credit report corrections, and disclosures to consumers. While at Equifax, I gained an intimate understanding of how credit files are compiled, stored, retrieved, and delivered. I also sold various Equifax Credit Marketing Services (CMS) products, which included lists for preapproved credit card offers.

At FICO (formally known as Fair Isaac Corporation and best known for its FICO credit scores), I spent an additional seven years gaining an intimate understanding of credit scoring, including how credit scores are designed, developed, used by lenders, and impacted by the information in consumer credit files. From time to time, I was involved with the development of FICO credit bureau scorecards, which are the heart of credit scores.

At Credit.com, I spent six years teaching consumers and the media how the consumer credit system works, including topics such as credit reporting, credit scoring, credit cards, and debt settlement, to name but a few. I was also the developer of the Credit Report Card, a credit-scoring tool that interprets Trans Union credit data like how a credit-scoring model would, and then gives the consumer an easy to understand summary of their credit risk. The tool won several awards in 2009 when it was released.

As a former employee of Equifax, Fair Isaac, and Credit.com, I have worked with, helped train, and supervised employees on processes and procedures involved in credit reporting, credit report dispute resolution, Fair Credit Reporting Act compliance, credit score model design and development, and consumer credit risk management.

I am also familiar with general underwriting practices, including what prospective lenders consider when determining credit risk. This includes a general understanding of what lenders consider important and not so important when considering a consumer's credit report. I gained this knowledge from many years of working with various lenders during my employment with Equifax, Fair Isaac, and Credit.com. In fact, during the first four years of my time at Fair Isaac, I taught members of the mortgage industry how to properly implement credit scoring into their processes. At the time, Fannie Mae and Freddie Mac had just mandated the use of FICO scoring in their two desktop underwriting systems, Loan Prospector and Desktop Underwriter. My role, among other things, was to teach industry trade associations, large national mortgage lenders, Fannie Mae, and Freddie Mac how FICO scoring worked, how consumer risk changed as deal variables changed, and how to educate their home-buying customers on the importance of solid credit management.

### B.    Presentations and Academia

I have made hundreds of credit reporting and credit scoring presentations during my time working in the credit industry. These presentations were delivered to consumers, consumer

groups, credit counselors, credit reporting agencies, nationally recognized lenders, members of the press, members of Congress, and banking authorities, and were of varying levels of complexity depending on the audience.

I frequently guest lecture about credit reporting and credit scoring at both The University of Georgia and The Westminster Schools in Atlanta. I have also taught at Emory University's Center for Lifelong Learning, where I was rated by the students as the top instructor in the Personal Finance and Investments category during the 2005-06 term. In April 2016 I began guest lecturing to 2nd and 3rd year students at the Emory University School of Law. I also volunteer my time teaching credit reporting and credit scoring fundamentals to members of the Georgia Consortium on Personal Financial Literacy.

I received a Bachelor of Science in Criminal Justice from the University of West Georgia in June 1991. I am well qualified to interpret and discuss the issues at hand in this case. My background and qualifications are set forth in my resume, which is attached as Exhibit A.

### C.    Publications

I am a frequent contributor on consumer credit issues to USA Today, New York Times, Wall Street Journal, Chicago Tribune, Los Angeles Times, Washington Post, Money Magazine, American Banker, SmartMoney, MarketWatch, CNN.com, MSNBC.com, Bankrate.com, and other regional business and consumer media outlets.

I have written the following books and training manual on the same topics, including *You're Nothing but a Number* (2007), *The GetCreditWise Tool Kit* (2007), *Surviving Identity Theft* (2007 w/ Emily Peters), and my most recent book, *The Smart Consumer's Guide to Good Credit: How to Earn Good Credit in a Bad Economy* (2012).

I have been a full time author since 2004 and the number of my publications to date is approximately 4,500. I currently write or have written regular articles on credit issues for newsletters, websites, and blogs, including a monthly column, "Ask John," for Credit.com's monthly e-newsletter, for Boardroom, Inc.'s monthly newsletter, *BottomLine Personal*, and for CreditBloggers.com, Credit.com, Enloop.com, CNBC.com, IMS Expert Services Newsletter, Mint.com, SmartCredit.com, CreditSesame.com's blog, the National Foundation for Credit Counseling's Financial blog, Credit Card Insider, Sky Rocket Media, The New York Times, JD Byrider's blog, MagnifyMoney, The Simple Dollar, Zillow, and VantageScore Solutions.

### D.    Certifications

Twice, I have been Fair Credit Reporting Act (FCRA) certified by the credit reporting trade association, the Consumer Data Industry Association (CDIA), and its predecessor, the Associated Credit Bureaus (ACB). The FCRA Certificate Program was developed to prepare consumer reporting agencies and companies that furnish information to the consumer reporting agencies to meet the requirements set forth in the FCRA. The course covers how consumers, credit grantors, and those who use and furnish information to consumer reporting agencies are affected by the FCRA.

> E.      Previous Expert Witness Work and Testimony

I have served as an expert witness in more than 350 lawsuits concerning credit issues and have been qualified to testify as an expert in both Federal and state courts. I have served as an expert for both plaintiffs and defendants, and for creditors and consumers. A list of matters on which I have testified in the last four years is attached as Exhibit B to this report.

## II.      SCOPE OF WORK

I was retained by counsel for Defendant Mountain America Credit Union ("MACU") and asked to provide an expert opinion, generally, on credit reporting, credit scoring, and credit damages.  I was also asked to offer rebuttal opinions, if necessary, and other opinions supported by the facts of the case.

## III.      COMPENSATION

I am being paid $475 per hour for all work performed. I have no financial interest in the outcome of this matter.

## IV.      DOCUMENTS REVIEWED

A list of documents and other information upon which I have considered and relied in forming my opinions set forth in this Report are attached as Exhibit C.

## V.      SUMMARY OF OPINIONS

Having reviewed the facts and materials in this case and based on my analyses presented in this Report, it is my opinion that:

1. MACU's credit reporting was neither a "duplicate account" nor did it indicate that MACU had "sold" the subject deficiency balance debt to any 3rd party, and no competent lender would be misled by MACU's credit reporting as being an incremental debt.

2. The dispute resolution process performed by MACU was normal and reasonable and it resulted in continued accurate credit reporting of the Plaintiff's repossession.

3. The Plaintiff, to this point, has produced no evidence suggesting he suffered economic credit damages as a result of MACU's credit reporting. Further, the Plaintiff has very poor credit irrespective of MACU's credit reporting.

4. The balances of 3rd party collections are not considered in FICO® credit scoring systems. And, the Plaintiff has a long history of very poor credit.

## VI.      COMPLETE STATEMENT OF ALL OPINIONS AND BASIS FOR OPINIONS

> A.      Background Regarding the Credit Reporting Industry

>> 1.      Credit Reporting Agency Background

A credit report is a record of an individual's current and past financial liability experience. The report includes information about a consumer's personal identity, their employment, collection agency accounts (if any), public records (liens, judgments, and bankruptcies only), as well as their account history (also called "trade"). There are a number of companies

that maintain consumer credit files and generate credit reports when requested by the consumer, a lender, an insurer, or another organization with a right to view such data.

These companies are called credit reporting agencies, consumer reporting agencies, or credit bureaus. They collect and store credit data and then generate and deliver credit reports using that data in response, for example, to requests from lenders or insurance companies who have received an application for credit or to bind insurance. There are three major, commonly recognized credit reporting agencies in the United States: Equifax, Experian, and Trans Union. Equifax, a public company, is headquartered in Atlanta, Georgia. Experian, a public company in the U.K., has its U.S. headquarters in Costa Mesa, California. Trans Union, a public company, is headquartered in Chicago, Illinois. Each of the three companies maintains over 200 million credit files. There are roughly 600-675 million consumer credit files in circulation.

### 2.      Data Furnisher Background

Information that is sent to the credit reporting agencies comes from companies generally referred to as "data furnishers." These companies are almost always going to be some sort of financial institution (e.g., a bank, credit union, finance company, or credit card issuer) or a debt collector. These furnishers will generally send their customer or debtor's account information to the credit reporting agencies once every statement cycle period, which is normally once per month.

The furnisher's information is normally sent to the credit reporting agencies via a magnetic tape or a system-to-system communication system. Once the credit reporting agency receives the furnisher's information, they will load it into their credit file database and disclose it on a consumer's credit report when requested.

The language furnishers use to communicate their customers' or debtors' information to the credit reporting agencies is called Metro 2. This language is the industry standard. Metro 2 consists of codes and characters which the furnisher uses to populate "cells" or data fields defined by the credit reporting agencies, and the credit reporting agencies then display the furnisher's account information on consumer credit reports and disclosures.

Every year the Consumer Data Industry Association ("CDIA") publishes a manual called the Credit Reporting Resource Guide or, informally, the Metro 2 Manual. This manual, which is approximately 290 pages, contains not only the Metro 2 language field layout but also a comprehensive list of the numerous codes used to report information to the credit reporting agencies, and a description of the conditions or scenarios when the codes should be used.

### 3.      Preparation of Credit Reports

A credit report is normally delivered to the lender, insurance company, consumer service provider or other requesting party when a consumer submits an application for some sort of benefit, such as a home loan, auto loan, credit card, subscription service, or insurance. The requestor or lender, referred to by the credit bureaus as a subscriber or user, submits a request for the consumer credit file. Using proprietary search logic, the credit bureau com-

piles a credit report using its stored data. This process is virtually instantaneous, giving lenders the ability to make instant credit decisions.

The information in a consumer credit report can be scored using a sophisticated algorithm called a credit-scoring model. The report and credit score are then used by lenders to determine an individual's credit risk. The information in a consumer credit report is not "real time," meaning it is not updated dynamically.

### 4.      Credit Scoring

A credit score is a number that summarizes an individual's credit risk based on a snapshot of his or her credit report at some point in time. A credit score helps lenders evaluate an individual's entire credit report *by estimating his or her likelihood of becoming 90 days late or worse on any credit obligation in the 24 months after the score is calculated*. The most widely used credit scores are FICO scores, the credit scores created by FICO (formerly known as Fair Isaac Corporation) and my former employer. Lenders can buy FICO scores from any of the three major credit reporting agencies. FICO develops its scores based on information in the consumer credit files maintained by the credit reporting agencies. A credit score may influence the credit available to the consumer and the terms that lenders offer to the consumer (e.g., interest rate, credit limits). Credit scores can be calculated using different scoring models, although FICO is the standard in the United States, Canada, and other countries that maintain sophisticated credit reporting systems.

### a.      Factors Affecting Credit Scoring

FICO scores take into account a number of credit report components. Those components that contribute to a FICO credit score and the relative weight of each (expressed as a percentage) are:

35% – **Payment History**: The presence or lack of negative information
30% – **Debt**: How much and what type
15% – **Length of Credit History**: How long an individual has had credit
10% – **Account Diversity**: The variety of credit experiences
10% – **Hard Inquiries**: A record of when an individual's credit report is accessed

**Payment History** (**35%** contribution on the FICO scale) – A record of negative information can potentially lower a consumer's credit rating or score. In general, risk scoring systems look for any of the following negative events: charge-offs, collections, late payments, repossessions, foreclosures, settlements, bankruptcies, liens, and judgments. Within this category, FICO considers the severity of the negative item (minor derogatory versus major derogatory), the age of the negative items, and the prevalence of multiple negative items.[1]

---

1. In the FICO and VantageScore scoring systems, a severe or major derogatory is anything that is currently past due, historically 90 days past due or worse, a public record, a collection, or any account status or narrative that indicates default or severe delinquency (e.g., repossession, foreclosure, settlement/short sale, collections, charge-offs). 30 and 60 day delinquencies are considered minor derogatory events.

**Debt** (**30%** contribution on the FICO scale) – FICO considers the amount and type of debt carried by a consumer. There are three types of debt considered:

> **Revolving debt:** This is credit card, retail card, and some gas card debt. While home equity lines of credit have revolving terms, the bulk of debt considered in this category is unsecured revolving debt incurred on "plastic." The most important measurement from this category is called "Revolving Utilization," which is the relationship between the consumer's aggregate credit card balances and available credit card limits, also called "open to buy." This is expressed as a percentage and is calculated by dividing aggregate credit card balances by aggregate credit limits and multiplying the result by 100, yielding the Revolving Utilization percentage. The higher the percentage, the lower an individual's FICO score likely will be. This is why simply closing credit cards is generally not a good method for improving one's credit score. Closing one or more credit card accounts will reduce an individual's total available credit limit and, in turn, likely increase the individual's Revolving Utilization percentage, unless the cardholder also reduces their outstanding balances as well.

> **Installment debt:** This is debt where there is a fixed payment for a set period of time, such as an auto loan requiring the same payment for 36, 48, or 60 months.

> **Open debt:** This is the least common type of debt. Open debt must be paid in full each month. A certain variety of credit cards require a consumer to "pay in full" each month. The American Express Green card is a common example.

**Length of Credit History** (Credit File Age) (**15%** contribution on the FICO scale) – The older an individual's credit report, the more stable it likely is. The credit file "age" is determined by looking at (1) the date the oldest account was opened, and (2) the average age of the accounts in the credit file. The age of the credit file is measured from the oldest account's "date opened" field. The average age is calculated using the "date opened" field on all accounts, whether they are currently open or closed.

**Account Diversity** (**10%** contribution on the FICO scale) – An individual's credit score will benefit from having a diverse set of account types in his or her credit file. Having experience across multiple account types (revolving, auto, mortgage, etc.) benefits an individual's credit score because the individual is proving an ability to manage different types of debt.

**Hard Inquiries** (**10%** contribution on the FICO scale) – An inquiry is noted every time a company requests some information from a consumer's credit file. There are several kinds of inquiries that may or may not affect one's credit score. Inquiries that have no effect on the creditworthiness of a consumer (including so-called "soft inquiries") can stay on a credit report for as little as 6 months and are never visible to lenders or credit scoring models. There are several types of soft inquiries:

Prescreening or promotional inquiries, where a credit bureau may sell contact information to credit card companies, lenders, or insurers for consumers who meet criteria set by the inquirer. Pre-approved credit card offers are mailed to consumers identified through a prescreening or promotional inquiry.

Creditors check current customers' credit files on a periodic basis through an account management, account maintenance, or account review inquiry.

When a consumer checks his or her own credit report it is referred to as a consumer disclosure inquiry.

Employment screening inquiries.

Insurance related inquiries.

Utility related inquiries.

Other types of inquires (known as "hard inquiries") can have an impact on the creditworthiness of a consumer. These inquiries are visible to lenders and credit scoring models. These inquiries usually result from a lender requesting a consumer's credit report when the consumer applies for an extension of credit. Hard inquiries can, but do not always, affect the borrower's credit score. Limiting the number of credit inquiries can help a consumer's credit score.

### b.     Scoring Models

#### i.      Multivariate Systems

Credit scoring models are multivariate, meaning they evaluate a variety of information on a credit report to generate a final score. No single credit item determines an individual's credit score. In fact, the impact of any one item on an individual's credit score is dependent on all of the other items on his or her credit report.

#### ii.     Multi-Scorecard Systems

Credit scoring models are actually a consolidation of multiple credit scoring systems called scorecards. A scorecard is a credit scoring model designed to evaluate the risk of a group of consumers who have certain similarities in their credit file (homogenous populations). For example, a consumer with a bankruptcy on his credit report is scored using a model or scorecard designed specifically to evaluate the credit risk of consumers who have filed bankruptcy. Similarly, a consumer with limited credit information (known as a "thin file") is scored using a model or scorecard designed to evaluate the credit risk of consumers with thin files. Most credit scoring systems have many scorecards, as there are many unique consumer profiles, each with different risk levels. The selection of the appropriate scorecard is made by the credit scoring system prior to calculating and rendering a final score.

#### iii.    Characteristics, Variables, and Weights

Each scorecard contains a series of characteristics, variables, and weights. A characteristic is a question asked of the credit report by the scoring system. For example, a common characteristic in most credit risk models asks, "how many accounts with a balance are present?"

Other examples[2] include:

---

[2] These are intended to illustrate the characteristic, variable and weighting process and is not meant to mimic the variable classing or weights of any particular credit scoring systems.

Does the consumer have any delinquencies on his or her credit report?
How long has it been since the consumer's most recent delinquency?
Does the consumer have a bankruptcy on his or her credit report?

While these examples are plain English questions, credit scoring systems answer the questions by reading the data embedded in the credit report. Scorecards regularly use at least 12 characteristics, and, in some cases, significantly more.

Each characteristic has what are referred to as variables. Variables are the series of available answers to the characteristics (or questions). The set of potential variables (or answers) to the sample[3] characteristics above might be:

- Does the consumer have any delinquencies on his or her credit report?
  (Yes or No)

- How long has it been since the consumer's most recent delinquency?
  (Less than 36 months ago or More than 36 months ago)

- Does the consumer have a bankruptcy on his or her credit report?
  (Yes or No)

And, while these examples are pretty simple ones, most characteristics have a much larger set of available variables.

Once the credit scoring system has completed the process of selecting the scorecard and determining the proper variable for each characteristic in that scorecard, the model assigns weights or points to each variable. For example, the model might assign points as follows:

- Does the consumer have any delinquencies on his or her credit report?
  If the answer is Yes, 0 points are awarded out of 100.
  If the answer is No, 100 points are awarded out of 100.

- How long has it been since the consumer's most recent delinquency?
  If the answer is Less than 36 months ago, 25 points are awarded out of 75.
  If the answer is More than 36 months ago, 75 points are awarded out of 75.

- Does the consumer have a bankruptcy on his or her credit report?
  If the answer is Yes, 0 points are awarded out of 50.
  If the answer is No, 50 points are awarded out of 50.

Once the model has assigned weights or points to each variable, the points are tabulated, resulting in a final credit score. The entire process is computerized and can be accomplished rather quickly. The credit score is usually appended to a credit report and delivered to the lender for use in risk management decisions.

---

3 The preceding and following characteristic and variable breakdowns, as well as the weights assigned on this report are EXAMPLES and do not represent the reality of any credit scoring system. These examples are simply meant to illustrate how a credit-scoring model considers information on a credit report.

### 5.         How The Data is Used – Risk Based Pricing

Risk-based pricing is a process used by creditors, insurance companies, landlords, retailers, and utility companies ("data users" or "subscribers"). Data users attempt to measure the downside financial risk of doing business with a particular consumer against upside gain if the product being offered to the consumer is priced appropriately. For example, if a consumer presents little risk, a lender can be more aggressive with the interest rate it offers because the consumer's credit score suggests that the consumer will pay on time. If a consumer presents a higher risk, the lender may decline the application or charge a higher interest rate in order to subsidize the risk posed by extending a loan to that consumer. Credit reports and credit scores have become synonymous with credit risk and risk-based pricing.

### 6.         The Dispute Resolution Process

A consumer can challenge information on a credit report by contacting the credit reporting agencies or furnishing party, although the consumer's rights may be different depending on who he or she contacts. A consumer can file a dispute with the credit reporting agencies on their websites, by U.S mail, telephone, or in person.

When a dispute is filed with a credit bureau, several things happen. First, the credit bureau reviews the relevant information sent by the consumer regarding the dispute.  This allows the credit bureau to determine the nature of the dispute, such as whether it's fraud related, a mixed or confused credit report issue, a credit clinic dispute, or some other type of dispute. Once the nature of the dispute is identified the credit bureau will direct it to the appropriate group. Further, consumers may provide supporting documents with their dispute.

The item in dispute is generally marked on the credit report as being "in dispute" by appending a specific code to the disputed item. This Compliance Condition Code[4] is represented by the letters "XB." When an XB code appears next to an item in a credit report, that particular item is excluded from any credit score characteristics that measure payment history or debt until the dispute is resolved or closed and the XB code is removed. This allows the credit reporting agency and data furnisher to conduct the requested investigations without the disputed item impacting the consumer's credit score while the investigation is open.

When the dispute is received by the credit reporting agency, a dispute code is assigned. These dispute codes assist the credit bureaus in communicating the type and nature of the dispute to the furnisher and guide (or limit) the investigative actions of the furnisher. For example, dispute code "001" refers to the situation where the "Consumer says [the account is] not his or hers, Provide or confirm complete ID."

These codes and other consumer information are then pre-populated on a form called an Automated Consumer Dispute Verification (ACDV) and sent to the furnisher via a web-based system called Online Solution for Complete and Accurate Reporting or "e-OSCAR." Recently e-OSCAR has been modified so that documents sent by the consumer to the credit

---

[4] A Compliance Condition Code ("CCC") is one of the variety of codes in the Metro-2 credit reporting language. According to the Credit Reporting Resource Guide, a CCC "allows the reporting of a condition that is required for legal compliance according to the Fair Credit Reporting Act or the Fair Credit Billing Act."

reporting agencies can be attached to the ACDV communication sent to the furnisher of the information. Once the data furnisher receives the ACDV via the e-OSCAR system, they can see the name and identification of the consumer, as well as the nature of the dispute.

The data furnisher usually has 30 days to determine if the consumer's dispute requires a modification to his or her credit report or if the challenged item is accurate. Either way, the data furnisher should fill out the "response" portion of the ACDV form with directions to modify the item, delete the item, or leave the item unchanged. The data furnisher's response is sent back the credit bureaus via e-OSCAR. Once the credit bureaus receive the data furnisher's response, they will modify, delete, or do nothing to the entry.

The credit bureau then sends or causes to be sent correspondence, usually by mail, to the consumer with the results of the investigation. Under the Fair Credit Reporting Act, this entire process may take up to 45 days, although the Consumer Data Industry Association (CDIA) reports that the process generally takes less time thanks to automation.

It is not uncommon for consumers to hire 3rd party companies to attempt to have negative information removed from their credit reports prematurely under false pretenses. These Credit Repair Organizations or Credit Services Organizations charge fees to dispute information on consumer credit reports, a process the credit reporting industry's trade association has referred to as "Jamming." According to Stuart Pratt, former President of the credit reporting industry's trade association, between 30-50% of all consumer disputes are being submitted by credit repair companies, most of them frivolous attempts to have accurate but negative information removed from consumer credit reports.

### 7.    The Fair Credit Reporting Act, Adverse Action and Risk Based Pricing Notices and Investigations

The Fair Credit Reporting Act ("FCRA") is the federal statute that defines, among other things, when credit reports can be accessed, consumer's rights, obligations of the credit bureaus and their data furnishers to perform reasonable investigations, and various notice requirements.

For example, when a consumer applies for and is denied a loan or credit card because of information on his or her credit report, including a credit score, the lender is required by the FCRA to provide a notice of adverse action, more commonly referred to as a declination letter. This letter is not optional but is rather auto-pilot, meaning the applicant doesn't have to overtly request the letter after they've been denied.

The notice must contain certain elements including the applicant's credit score, from what credit bureau the lender obtained the credit report, the credit bureau's address, and a notice of a consumer's right to obtain a free copy of their credit report because of the declination.

Further, when a consumer applies for and is adversely approved[5] for a loan or credit card because of information on his or her credit report, including a credit score, the lender is required by the FCRA to provide a Risk Based Pricing notice. This letter, like the adverse ac-

_____

[5] An Adverse Approval is an approval for credit, but not with the lender's best terms.

tion letter, is auto-pilot. The absence of adverse action or risk based pricing notices means the applicant was approved and given a lender's best or near best available terms.

The FCRA also obligates the credit reporting agencies and their data furnishers to perform investigations when they've been put on notice that the consumer challenges the accuracy of information on their credit reports.  There is no statutory standard of what constitutes a "reasonable" investigation in the FCRA and what is reasonable will depend on the facts and nature of the consumer's dispute.

Most furnishers of information will review the dispute form submitted by the credit bureaus, review their internal records, access multiple systems containing account related information, and will also have access to review any attachments to the dispute which the consumer may have included with their communication to the credit bureau(s). This is a common method of investigation by a furnisher.

> **B.     Opinion #1 – MACU's credit reporting was neither a "duplicate account" nor did it indicate that MACU had "sold" the subject deficiency balance debt to any 3rd party, and no competent lender would be misled by MACU's credit reporting as being an incremental debt.**

The Plaintiff makes a number of allegations in his Amended Complaint that are demonstrably incorrect or misrepresent the facts of this case.

The Plaintiff borrowed money from MACU to purchase a car (the "loan"). The Plaintiff defaulted on the loan. MACU had the car repossessed and sold at auction. Because the sale of the car at auction did not yield sufficient funds to pay off the loan, there was a deficiency balance. The Plaintiff is liable for the deficiency balance. MACU reported this account history to the credit bureaus, as is commonly practice.

MACU reported the aforementioned information to the credit reporting agencies using a language called "Metro."  Metro, now Metro-2, is the credit industry standard reporting language[6]. It is, in fact, the only way any company can furnish information to the credit reporting agencies. There are no other credit reporting options other than Metro-2.

Based on my review of MACU's credit reporting chronology, MACU furnished the following fields and codes to the credit reporting agencies using the Metro language and Metro codes;

Account Number, Portfolio Type, Account Type, Date Opened, Amount Borrowed, Duration of Loan or "terms", Frequency of Payment, Scheduled Monthly Payment, Actual Amount Paid, Account Status, Payment History, Special Comment Code, Current Balance, Amount Past Due, Original Charge Off Amount, Date of Account Info, Date of First Delinquency, Date

---

[6] The Metro credit reporting language was created jointly by the credit reporting agencies. Every year representatives of the credit reporting agencies meet and discuss potential changes to the Metro language, if any. Regardless, every year a manual is published by the credit industry's trade association, the Consumer Data Industry Association, with the most current iteration of the Metro language. This manual is formally referred to as the Credit Reporting Resource Guide or, informally, the Metro-2 manual or the "CRRG."

of Last Payment, Surname, First Name, Middle Name, Social Security Number, Date of Birth, Telephone Number, ECOA Code, Country Code, and Full Address.

Notably, the Account Status field was reported with code "97." Code 97 indicates the account is charged off.[78] The Portfolio Type field was reported with code "I." Code I indicates the account is an installment account. The Account Type field was reported as "00." The OO code indicates the account is an auto loan. The Payment History field was reported with code "L." Code L indicates the loan had been charged off previously. The Special Comment Code was reported with code "BK." Code BK indicates "Involuntary repossession with a balance owing." The Date of 1st Delinquency was reported with the date "04_15_2015.[9]" The ECOA field was reported with code "1." Code 1 indicates the account was an "individual" account, meaning only the Plaintiff was liable for the debt associated with the subject MACU loan.

This information as reported by MACU, as reported through these codes, was accurate.

Credit reports generated by the credit reporting agencies, including those provided to lenders and those provided to consumers, are based on the aforementioned Metro codes and fields. MACU, and all furnishers of information, are limited to transmitting codes and values using the Metro language.  This process is not controlled or influenced by MACU or any furnishers of information to the credit reporting agencies.

There is nothing wrong with the credit reporting of auto loans, repossessions and deficiency balances. In fact, this type of reporting has been a part of consumer credit reporting for many decades.

MACU, as do thousands of other creditors, eventually assigned the deficiency balance to a 3rd party debt collector, Financial Assistance, for collection. 3rd party debt collectors, as a common and accepted practice, report information about their assignments to the credit bureaus, and include the balances of said assignments.  This too has been a part of consumer credit reporting for many decades.

The Plaintiff contends MACU reported a duplicate[10] account to the credit reporting agencies. This is incorrect. MACU only reported one account or "tradeline" to the credit reporting agencies.

---

[7] All references to fields, field values and codes are from the Credit Reporting Resource Guide.

[8] In the credit reporting context, the term "charged off" indicates that a loan or liability has gone into default due to non-payment. Charged off does not mean a debt is no longer owed or that a lender does not intend to seek collection of the defaulted debt.

[9] The Date of First Delinquency, also called the "purge from date" or "anchor date", is the date used by the credit reporting agencies from which to start the 7-year credit reporting clock. MACU reported April 2015 as the Date of First Delinquency on the Plaintiff's loan. As such, all credit reporting agencies would remove the loan from the Plaintiff's credit report no later than April of 2022. Any assignment of the MACU loan to a 3rd party would also be removed no later than April of 2022.

[10] See Amended Complaint, paras 20-22.

The "duplicate account" moniker as it pertains to credit reporting is appropriate only when the furnisher of information, like MACU, furnishes the same account more than one time, thus causing it to show up more than one time on a consumer's credit report. MACU did not and never reported the loan more than once to the credit reporting agencies. If it had the Plaintiff would have had two separate MACU loans appearing on his credit reports, which he never did.

The Plaintiff also contends MACU's credit reporting, "clearly means the Plaintiff is liable twice for the same debt."[11]  This too is incorrect. Notwithstanding the fact that MACU never reported the loan more than once on any given credit report, the Financial Assistance reporting clearly indicates that they are collecting a debt on behalf of MACU as a result of a deficiency balance from Plaintiff's repossession.[12]

In fact, debt collectors are required by the credit reporting agencies to provide the name of the original creditor as part of their credit reporting. The multiple 3rd party collections that appear on the Plaintiff's credit reports include the names of the various original creditors.[13] As such, no competent lender would be misled by MACU's credit reporting as being an incremental debt or that the Plaintiff is somehow liable for the same debt twice, or any derivative of the allegation. There is no document production or testimony in the record of this lawsuit suggesting any such misunderstanding of the MACU credit reporting.

### C.  Opinion #2 – The dispute resolution process performed by MACU was normal and reasonable and it resulted in continued accurate credit reporting of the Plaintiff's repossession.

The Plaintiff contends in his Complaint that the Defendant, MACU, reported incorrect information to the credit reporting agencies because it suggests the Plaintiff is liable for the debt twice.[14] The Plaintiff further suggests the reporting by MACU is duplicative because their 3rd party debt collector, Financial Assistance, is also reporting the debt to the credit reporting agencies.[15]  Finally, the Plaintiff suggests in his Complaint that MACU failed to perform an investigation pursuant to the Plaintiff's disputes.[16] I respectfully disagree with the aforementioned allegations.

The Plaintiff submitted numerous disputes to the three credit reporting agencies regarding his MACU repossession, most or all of which appear to come from credit repair organizations.[17] Some of these disputes address the validity of the Plaintiff's listed personal information which is not relevant to MACU's credit reporting. Some of these disputes address

---

[11] See Amended Complaint, para 22.

[12] See Amended Complaint, para 28.

[13] See EXP-COOK 17.

[14] See Amended Complaint, para 22.

[15] See Amended Complaint, para 29.

[16] See Amended Complaint, para 50.

[17] See EXP-COOK 6, 60 and COOK 1, 2, 86, 92, 100, 101, 102, 133, 143, 144.

whether or not the credit bureaus completed their investigation within 30 days, which is again not relevant to MACU's credit reporting.

Some of these disputes contend that MACU was reporting their subject account as being "transferred or sold" and thus MACU no longer owned the account and cannot report it as a collectible debt.[18] This is a misrepresentation of MACU's actions with respect to the Plaintiff's repossession. MACU did not and never "sold" anything to Financial Assistance or any other 3rd party. As such, their reporting of a balance associated with the Plaintiff's repossession deficiency balance was accurate as they were still the creditor. Additionally, none of the documents produced in this lawsuit indicate that MACU sold any debt to a 3rd party or provided any Metro code to the credit reporting agencies indicating that they sold the Plaintiff's debt to any 3rd party.[19]

Some of the disputes do not specify a dispute regarding MACU's credit reporting but the process taken by the credit reporting agency to conduct their investigation[20], a common credit repair tactic. This, again, is not an issue directed to MACU.

The disputes the Plaintiff submitted directly to MACU[21], which also appear to have come from a credit repair company, again suggest that because MACU "sold" the subject debt to a 3rd party that they can no longer report a balance on the account. Again, this is a misrepresentation as MACU did not sell the Plaintiff's deficiency debt to anyone. MACU retained the ownership of the debt.

The Plaintiff's 11/30/2017 letter to MACU[22] further suggest that MACU is reporting an incorrect "date reported" to the credit reporting agencies. This is incorrect and systemically impossible. The Date Reported is not a field controlled by MACU or any furnisher of information to the credit reporting agencies.  The Date Reported is, instead, a date wholly controlled by the credit reporting agencies and is not part of the "Metro" credit reporting language used by furnishers to provide information to the credit reporting agencies. As such, this too is not an issue under MACU's control or an attribute that can be altered by MACU.

MACU was always the creditor associated with the Plaintiff's repossession. As such it has always been appropriate for MACU to report the loan with a balance.

---

[18] See EXP-COOK1 and COOK86.

[19] In the Metro credit reporting language the "K2" segment is the field used to indicate the sale of a debt to a 3rd party. MACU did **not** report any value in the K2 field to the credit reporting agencies indicating the sale of their debt to any 3rd party.

[20] See EXP-COOK60 as an example.

[21] See COOK 145-148.

[22] See COOK 145-146.

> **D.**   **Opinion #3 – The Plaintiff, to this point, has produced no evidence suggesting he suffered economic credit damages as a result of MACU's credit reporting. To the contrary, the documents produced in the record of this lawsuit indicate the Plaintiff was not denied credit or housing as a result of MACU.**

The Plaintiff contends that due to MACU's credit reporting he has been denied mortgage and rental applications.[23] I respectfully disagree. The Plaintiff's rental applications were either approved (Peace Properties) or denied because of reasons unrelated to MACU. The mortgage lender identified by the Plaintiff has no record of documents related to the Plaintiff.

## Rental Applications

*Lotus Real Estate*[24] – On or about 10/03/2017 the Plaintiff and his wife applied to rent a home in Laveen Arizona through Lotus Real Estate, a property management company. A representative of Lotus Real Estate has no recollection of denying their application but instead "moved on with other applications because of a lack of communication from Tyler and Jessica (Cook)."

Timing of Application Relative to Plaintiff's Credit Disputes – It's worth noting that the date of the Lotus Real Estate application occurred at least five weeks before MACU received the Plaintiff's first credit reporting dispute.

Unrelated Negative Credit Information – Notwithstanding Lotus Real Estate's representation that they have no recollection of denying the Plaintiff's application, the Plaintiff had a large amount of negative information on his Experian credit report procured by Lotus Real Estate that was unrelated to either MACU or Financial Assistance. The Plaintiff had four charged off accounts and three other accounts in collection status at the time of his application. Further, the Plaintiff's co-applicant also had a large amount of negative information on her Experian credit report including two collections, six late payments on a credit card account, a charged off utility account, and a Chapter 7 bankruptcy.

*Rentals America*[25] – On or about 10/25/2017 the Plaintiff applied to rent a home through Rentals America. According to records produced by Rentals America the Plaintiff was denied because of his "collections count and outstanding debt." According to Rentals America the Plaintiff had "more than $2500 in outstanding debt" and "more than 5 outstanding collections." The Equifax credit report procured by Rentals America did **NOT** contain a collection from Financial Assistance. It appears the Plaintiff's application would have been denied regardless of MACU's credit reporting given the Plaintiff's failure of Rental America's approval criteria.

---

[23] See Amended Complaint, paras 42-43 and Plaintiff's Mandatory Initial Discovery Responses, number 1.

[24] See MACU 1285-1325.

[25] See MACU 1326-1347.

Timing of Application Relative to Plaintiff's Credit Disputes – It's worth noting that the date of the Rentals America application occurred almost two weeks before MACU received the Plaintiff's first credit reporting dispute.

Unrelated Negative Credit Information – The Plaintiff had a large amount of negative information on his Equifax credit report procured by Rentals America that was unrelated to either MACU or Financial Assistance. The Plaintiff had six charged off accounts on his Equifax credit report at the time of his application.

*Peace Properties*[26] – On 10/25/2017 the Plaintiff applied to rent a home through Peace Properties. According to records produced by Peace Properties the Plaintiff's application was approved.

Timing of Application Relative to Plaintiff's Credit Disputes – It's worth noting that the date of the Peace Properties application occurred almost two weeks before MACU received the Plaintiff's first credit reporting dispute.

*Realty ONE Group*[27] – On 03/01/2019 Realty ONE Group's custodian of records responded to MACU's subpoena indicating they have no records responsive to those listed in the subpoena.

*Waypoint Homes*[28] – According to documents produced by Waypoint Homes, the Plaintiff had email communication with Laniesha Newton from Waypoint Homes between October 1, 2017 and October 3, 2017. The email communication is a back-and-forth between the Plaintiff and Laniesha Homes regarding disqualifying credit report information. There is no mention of an actual lease application or a denial of a lease. And certainly, there is no mention of a lease application that was denied because of information reported by MACU or Financial Assistance.

**Mortgage Applications**

*Price Mortgage*[29] – On 02/21/2019 Price Mortgage, LLC's custodian of records responded to MACU's subpoena indicating they have no records responsive to those listed in the subpoena. Further, Price Mortgage indicated that they "do not recall having any conversations with Tyler Cook or Jessica Cook" and have no record of any email communications with either of the Cooks.

---

[26] See MACU 1348-1399.

[27] See MACU 1400-1401.

[28] See MACU 1402-1445.

[29] See MACU 1236-1237.

**E.**    **<u>Opinion #4</u> – The balances of 3rd party collections are not considered in FICO®
credit scoring systems. And, the Plaintiff has a long history of very poor credit.**

The Plaintiff contends that he has been damaged in the form of "reduced credit scores due
to inaccurate information."[30] I respectfully disagree.

*Failure to Provide Analysis* – The impact of any item or items on a consumer's credit report
can be tested in such a way as to quantify its impact on a consumer's FICO® credit score. As
of the date of this Expert Report the Plaintiff has produced no credit score impact analysis
attempting to quantify the impact of MACU's credit reporting or Financial Assistance's
credit reporting. I reserve the right to perform an impact analysis in the event the Plaintiff's
expert witness contends that either MACU's or Financial Assistance's credit reporting was
incorrect and had an impact on the Plaintiff's credit scores.

*Unrelated Negative Credit Information* – The Plaintiff's credit reports produced as part of
the record of this lawsuit indicate a long history of credit mismanagement. By way of ex-
ample, the Plaintiff's Experian credit report disclosures dated 11/08/2017 and
11/22/2017[31] contain a record of the following derogatory credit entries unrelated to ei-
ther MACU or Financial Assistance;

Best Buy credit card – 3 late payments, as severe as 60 days past due
CitiMortgage mortgage loan – 11 late payment, as severe as 120 days past due.
Firestone charge card – Account charged off, 9 late payments
Elan Financial Services credit card – Account charged off, 8 late payments
EOS Collection – Collecting for a defaulted Verizon Wireless account
US Bank credit card – Account charged off, 7 late payments
Wells Fargo Dealer Services – 7 late payments, as severe as 60 days past due
Wells Fargo credit card – Account charged off, 6 late payments
WFFNB/Furniture for Less charge card – Account charged off, 6 late payments
AFNI Collection – Collecting for a defaulted Sprint account.

NOTE: The above inventory of derogatory entries does not include the MACU loan, however
it is not in dispute[32] that the Plaintiff did, in fact, default on said loan. As such, any invento-
ry of derogatory information would be justified in including the MACU loan. The same can
be said with respect to the Financial Assistance credit reporting.

Unrelated negative information is meaningful for at least two reasons. First, to the extent
the Plaintiff was denied credit due to poor credit reports or poor credit scores, the records
indicate the Plaintiff already had very poor credit reports and scores irrespective of MACU
or Financial Assistance. Second, to the extent the Plaintiff or his expert witness is claiming
Plaintiff's credit scores are poor as a result of MACU or Financial Assistance, this is demon-
strably false as credit scoring systems will see and consider all of the above unrelated nega-

---

[30] See Plaintiff's Mandatory Initial Discovery Responses, number 5.

[31] See EXP-COOK 14-33 and 39-46.

[32] See Amended Complaint, para 16.

tive information, including the five charged off accounts, two collections, and 57 late payments appearing on the Plaintiff's credit report.

NOTE: I have performed countless of the above referenced credit score impact analyses. It is unlikely the MACU or Financial Assistance credit reporting had any measurable impact on the Plaintiff's credit scores given the considerable amount of unrelated derogatory information appearing on the Plaintiff's credit reports.

_3rd Party Collection Balances Bypassed by Scoring Systems_ – To the extent the Plaintiff contends or will contend that the balance of the Financial Assistance collection account is damaging his credit scores, this is factually incorrect. FICO's credit scoring systems do not consider the balances associated with 3rd party debt collections, such as those reported by Financial Assistance.  As such, any value residing in the balance field of a 3rd party collection account is immaterial to a consumer's credit scores. What this means is the balance associated with Financial Assistance's credit reporting had no impact on the Plaintiff's credit scores because it is not a scored value.

*       *       *       *       *

This expert report is based on my 27+ years of experience and knowledge gained as a professional in the consumer credit industry, specifically as an employee or contractor of Equifax Credit Information Services, Fair Isaac Corporation, Credit.com, and Credit.com Educational Services, on my review of relevant documents produced in this matter, and as a result of my previous expert witness work, which includes more than 350 cases. All of my comments are accurate to the best of my knowledge as of the time I prepared this report. All of the opinions and comments stated in this report are expressed to a reasonable degree of professional certainty.

I reserve the right to supplement or amend my opinions. I declare that the foregoing is true and accurate to the best of my ability based on the documents I have reviewed, my education, my experience, my training, and my expertise.

Executed this 8th day of March 2019,
in Atlanta, Georgia



John Ulzheimer

**Exhibit A**

### John Ulzheimer

### The Ulzheimer Group, LLC, President
### 1160 Buckhead Valley Court
### Atlanta, Georgia 30324
### (404) 636-3737

John Ulzheimer, President of The Ulzheimer Group, LLC and Founder of www.creditexpertwitness.com, is a nationally recognized expert on credit reporting, credit scoring and identity theft. In addition, his expertise includes FCRA, FDCPA, CROA, credit report damages and the resulting economic damages. He serves as an expert witness/legal consultant for those involved in credit related litigation and has been qualified and admitted as an expert in Federal and State court.

John is _twice_ FCRA certified by the Consumer Data Industry Association (the trade association of the credit reporting agencies) and has 27+ years of experience in the consumer credit industry including positions with Equifax Credit Information Services (6 years), Fair Isaac, which is the inventor of the FICO® credit scoring system (7 years), Credit.com (6 years), and years of concurrent work with a number of consumer credit related companies.

John currently is or was the credit blogger for the New York Times, Mint, CreditSesame, CreditSimple, Zillow, JD Byrider Systems, Credit.com, SmartCredit, VantageScore Solutions, The Simple Dollar and the National Foundation for Credit Counseling. John has been published over 4,500 times in the past 14 years on the topic of consumer credit. He has authored or co-authored numerous educational materials on the subject including:

- The book_, The Smart Consumer's Guide to Good Credit_
- The book, _You're Nothing but a Number, Why achieving great credit scores should be on your list of wealth building strategies._
- The consumer handbook, _Surviving Identity Theft._
- The consumer handbook, _The Get Credit Wise ToolKit_
- _Use of Compliance Condition Codes,_ CO Bar Association Newsletter

**Relevant Experience at Equifax** – Managed consumer dispute process including consumer interview, logging consumer dispute onto credit report, communicating with data furnisher to validate credit file accuracy, modified consumer credit report according to results of investigation, and communicate dispute resolution results to consumers.

Managed relationship between Equifax and thousands of small customers, such as credit unions, car dealerships, banks, and collection agencies. Role included pricing negotiations, cross selling credit products including Credit Marketing Services, credit scores, fraud detection services and data access software.

Managed relationship between Equifax and large strategic clients based in Jacksonville, Florida including large regional bank and national credit card issuer. Role included pricing negotiations, cross selling credit products including Credit Marketing Services, and credit scores.

**Relevant Experience at Fair Isaac** – Supported all of Fair Isaac's credit bureau based scores sold by North American credit reporting agencies; Equifax, Equifax Canada, TransUnion, TransUnion Canada, and Experian. Managed credit score pricing for several years. Well versed in credit score validations, impact analyses, score migration studies, credit scorecard development and what influences credit scores. Performed hundreds of credit score trainings to audiences of all levels of sophistication including lenders, credit bureaus, and members of Congress, consumer groups and consumers.

John frequently appears on CNBC, FOX News, CNN and NPR. He has contributed content for CNBC's "On The Money", Freddie Mac's "Know Your Score" campaign, Oprah's "Debt Diet" series and The Suze Orman Show. He is also a frequent commentator on credit-related issues in various outlets including USA TODAY, Associated Press, CNBC, NPR, Los Angeles Times, CNN, FOX, Washington Post, Money Magazine, American Banker, Wall Street Journal, SmartMoney, MarketWatch, MSNBC.com, The Motley Fool, Chicago Tribune, Bankrate.com, and other regional business and consumer media.

In his hometown of Atlanta, John is regular guest lecturer at The Westminster Schools, The University of Georgia and the Georgia Consortium for Personal Financial Literacy. Between 2004 and 2007 John taught a course on credit reporting and scoring at The Emory University Center for Lifelong Learning and was named by the students the Top Personal Finance and Investments Instructor for the 2005/2006 term. In April 2016 John began guest lecturing at Emory University's School of Law. John graduated in 1991 from The University of West Georgia with a B.S. degree in Criminal Justice and is currently a graduate student at The Pennsylvania State University.

**Certifications and Awards:**

**FCRA Certified – Consumer Data Industry Association - 2011. Perfect score on certification test.**

**Associate Credit Executive – International Credit Association. 1997.**

**FCRA Certified – Associated Credit Bureaus - 1992.**

**Consumer Credit Interviewer – Designation Conferred by Equifax as part of their employee training program.**

**Graduate – American Bankers Association School of Bankcard Management held at The University of Delaware – 2000**

**2014 Consumer Advocate Award – National Foundation for Credit Counseling.**

**Exhibit B**

## Expert Testimony in the Last Four Years

*Pele v PHEAA* – Deposition (USDC East Dist of VA, 1:13CV1531)
*Davidson v Capital One* – Deposition (USDC So Dist of FL, 14-20478-CIV)
*Skagerberg v Wells Fargo* – Deposition (Dist Court of Harris Co, TX 2011-52554)
*Marchisio v Carrington Mortgage* – Deposition (USDC So Div of FL, 2:14-cv-14011)
*Noori v Bank of America* – Deposition (USDC Cent Dist of CA, cv15-01467-AB)
*Kealy v Ford Motor Credit* – Deposition, Trial (Sup Ct of CA, LA County BC497696)
*Best v Bluegreen* – Deposition (USDC So Dist of FL 14-80929-civ-cohn)
*Callaly v Lieberman Management* – Deposition (Circ Ct, Du Page Co, IL. 11L545)
*Vasquez-Estrada v Collecto, Inc* – Deposition (USDC Dist of OR, 3:14-cv-01422)
*Boydstun v US Bank* – Deposition (USDC Dist of OR, Portland Div 3:11-cv-429)
*Duell v FNBO* – Deposition (USDC So Dist of CA, 14-cv-2774)
*Daugherty v Equifax, et at* – Trial (USDC So Dist of WV, Beckley Div 5:14-24506)
*Neal v Trans Union, et al* – Deposition (USDC West Dist of MO, 6:15-cv-03474)
*Barakat v Capital One, et al* – Deposition (USDC East Dist of MI, 16-cv-10718)
*Harrah v SLS* – Deposition (USDC East Dist of VA, 4:15cv95)
*Robinson v Wells Fargo* – Deposition (USBC Southern Dist of TX, 14-03290)
*Thompson v Wells Fargo* – Deposition (Jefferson Circuit Court, Div 6, 11-CI-04347)
*Jones v PHEAA* – Deposition (USDC Cent Dist of CA, 2:16cv-00107)
*Ogden v International Paper* – Deposition (Dist Ct of Jefferson Co., TX B-195,960)
*Bastek v Comenity Bank* – Deposition (Sup Ct of CA, San Diego Division, 37-2016-17012)
*Filion v Wells Fargo* – Deposition, Trial (Sup Ct of CA, Ventura Co, 56-2013-00424511)
*Robbins v CitiMortgage* – Deposition (USDC Northern Dist of CA, 16-cv-4732)
*Kamimura v Ditech* – Deposition (USDC Dist of NV, 2:16-cv-00783)
*Kim v PHEAA* – Deposition (USDC So Dist of CA, 3:17-cv-00528)
*Anderson v Wells Fargo* – Deposition (USDC No Dist of TX 3:16-cv-2514)
*Williams v Goodman* – Deposition, Trial (3rd Judicial Circuit, Columbia Co, FL 14-158-CA)
*Barnum v Equifax* – Deposition (USDC Dist of NV 2:16-cv-02866)
*Bryant v Anderson* – Deposition (Circuit Ct of Jasper Co, MO, No. 16AO-CC00238)
*Neal v Westlake Financial* – Deposition, Arbitration (JAMS Ref. No. 11100198687)
*Rennick v Equifax* – Deposition (USDC Middle Dist of Fl., 8:17-cv-01617)

**Exhibit C**

## Documents Reviewed

Amended Complaint
Motion to Dismiss Order
MACU 350-356
COOK1-204
EXP-Cook1-89
Plaintiff's Mandatory Initial Discovery Responses and First Supplemental Responses
Plaintiff's Responses to Defendant's First Request for Production of Documents
Plaintiff's Responses to Defendant's First Set of Non-Uniform Interrogatories
Documents Labeled MACU1326-1347 (Rentals America)
Documents Labeled MACU1285-1325 (Lotus Real Estate)
Documents Labeled MACU1236-1237 (Price Mortgage)
Documents Labeled MACU1400-1401 (Realty One)
Documents Labeled MACU1348-1399 (Peace Properties)
Documents Labeled MACU1402-1445 (Waypoint Homes)
Plaintiff's Witness List
The Credit Reporting Resource Guide