Robert W. Norman (SBN 025328)
bnorman@houser-law.com
Solomon S. Krotzer (SBN 027985)
skrotzer@houser-law.com
HOUSER & ALLISON, APC
2929 N. Central Avenue, Suite 1560
Phoenix, Arizona 85012
Ph: (480) 428-8370

Attorneys for Defendant Mountain America Federal Credit Union

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF ARIZONA

| | |
|---|---|
| Tyler Cook, | Case No. 2:18-cv-01548 |
| Plaintiff, | Honorable H. Russel Holland |
| vs. | **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| Mountain America Federal Credit Union; Experian Information Solutions, Inc.; Equifax Information Services, LLC; TransUnion, LLC; and Financial Assistance, Inc. | **FRCP 56** |
| Defendants. | |

Pursuant to Federal Rule of Civil Procedure ("FRCP") 56, Defendant Mountain America Federal Credit Union ("MACU") hereby submits its Motion for Summary Judgment.

### I. INTRODUCTION.

This is a credit reporting case in which Plaintiff Tyler Cook ("Cook") alleges "inaccurate" credit reporting, but unlike other credit reporting cases, Cook does not take issue with any specific information reported by MACU. Rather, Cook's primary argument appears to be that even though MACU and (now dismissed) Financial Assistance both reported "accurate" information, the fact that they both reported was improper "double reporting."

First of all, this is a very novel theory and based on this alone there is no "willful" violation under § 1681n and associated *Safeco* "safe harbor."

Second, Cook has failed to point to any industry standard dealing with "double reporting." While "double reporting" has been alleged in other FCRA cases, those cases generally deal with one creditor submitting two trade lines, or a creditor continuing to report even after selling the debt. None of these situations is present in this case, and even in those cases courts have rejected the "double reporting" argument.  *See e.g. Gustafson v. Experian Information Solutions, Inc.,* 2015 WL 3477071 (C.D. Cal. June 2, 2015) (rejecting "double reporting" argument and granting motion for summary judgment).

Third, nothing in Cook's dispute notices conveyed concerns about "double reporting" and the law *does not require* a furnisher to investigate further than what is described in the notice of dispute.  *Gorman v. Wolpoff & Abramson, LLP,* 584 F.3d 1147, 1157 (9th Cir. 2009).

Fourth, Cook has failed to prove "actual" damages.  For any of these reasons, summary judgment is appropriate.

## II. UNDISPUTED MATERIAL FACTS.

### a.  The Debt.

On February 14, 2013, Cook purchased a Dodge Grand Caravan ("Vehicle") from a dealership in Arizona.[1]  Cook financed the purchase of the Vehicle with a $28,720.66 loan ("Loan").[2]  Cook made monthly payments towards the Loan until 2015 when he

---

[1] See of Deposition of Tyler Cook, Pgs. 16:12-14, 20, 25.  Select Portions of the Deposition of Tyler Cook are attached as **Exhibit A**.

[2] See **Exhibit A**, Pg. 18:2-17.

defaulted and the Vehicle was repossessed.[3] After the Vehicle was sold, there was a deficiency balance remaining of $14,115.63 ("Debt").[4]

### b. Collection Efforts and Agreement with Financial Assistance Inc.

MACU took efforts to collect the Debt in 2015 through its internal collections department.[5] After MACU's internal collection efforts were unsuccessful, the Debt was designated as a "Charged Off Loan" in MACU's system.[6]   The original "Charge Off Amount" was $14,115.63.   However, in December 2015 a refund of the unearned service contract in the amount of $464 reduced the balance owing to $13,651.63.[7]

On or about December 4, 2015, Financial Assistance entered the MACU-owned account for Tyler Cook into its collection system for continued collection efforts.[8] MACU had previously entered into a "Collection Agreement" with Financial Assistance dated May 21, 2014 that encompassed many accounts including the Cook account.[9] The Collection Agreement makes it clear that Financial Assistance is collecting the Debt on behalf of MACU and at no time was the Debt owned by any entity other than MACU.[10]

### c. Metro Codes Submitted by MACU.

MACU furnished information to the credit bureaus using a language called "Metro."[11] "Metro" (now Metro-2) is the credit industry standard reporting language.[12] "Metro" is the only way a company can furnish information to the credit reporting

---

[3] See **Exhibit A**, Pgs. 22:10-23:14.
[4] See **Exhibit A**, Pgs. 27:19-28:24.
[5] See Declaration of Catherine Bates, ¶ 8, attached as **Exhibit G**.
[6] See **Exhibit G**, ¶ 9.
[7] See **Exhibit G**, ¶ 11.
[8] See Deposition of Woody Woodruff, Pg. 19:2-12, attached as **Exhibit F.**
[9] See **Exhibit F**, Pg. 9:18-25.
[10] See **Exhibit F**, Exhibit 1; **Exhibit G**, ¶ 15.
[11] See **Exhibit G**, ¶ 17; See Expert Report of John Ulzheimer, attached as **Exhibit B**, Pg. 12.
[12] See **Exhibit B**, Pg. 12**.**

agencies, as there are no other credit reporting options.[13]  MACU furnished a single loan record, or tradeline, to the credit bureaus with information about the Debt.[14] MACU did not furnish a duplicate account or duplicate information.[15]  For example, the "current balance" was reported as "13651."[16] The Account Status field was reported with Code "97" which indicates the account is "charged off."[17]  Cook's expert, Thomas Tarter, admitted that there was nothing inaccurate about the Metro codes submitted, and that there was nothing else that should have been transmitted, no other fields should have been populated.[18]

### d.  Cook Applies for Rental Properties.

In August 2017, Cook sold property that he had owned since roughly 2010.[19] On October 3, 2017, Cook applied for a rental property with Lotus Real Estate ("Lotus").[20] Lotus never sent a denial letter to Cook.[21] Lotus sent a letter stating "we would have no problem approving [Cook]."[22] Cook also sent an inquiry to a company called Waypoint Homes concerning the possibility of getting a rental property, but Cook decided not to apply with Waypoint Homes.[23]  Cook applied with a company called Rentals America, and on October 25, 2017 Cook was declined.[24] Cook admitted that he does not know why Rentals America denied the application.[25] In any event, Cook ultimately found a

---

[13] See **Exhibit B**, Pg. 12.
[14] See **Exhibit G**, ¶ 18, ¶ 29; See **Exhibit B**, Pg. 12-13.
[15] See **Exhibit G**, ¶ 18; See **Exhibit B**, Pg. 4, 12-14.
[16] See **Exhibit G**, ¶ 19.
[17] See **Exhibit G**, ¶ 20; See **Exhibit B**, Pg. 13.
[18] See Deposition of Thomas Tarter, Pgs. 62:10-69:3, 168:4-24, attached as **Exhibit D**.
[19] See **Exhibit A**, Pgs. 33:22-34:5.
[20] See **Exhibit A**, Pg. 41:11-17.
[21] See **Exhibit A**, Pg. 50:23-51:4.
[22] See **Exhibit A**, Exhibit 4, MACU 01285.
[23] See **Exhibit A**, Pgs. 54:10-55:9.
[24] See **Exhibit A**, Exhibit 6.
[25] See **Exhibit A**, Pg. 61:5-20.

rental property and signed a long-term lease a few days after he was declined by Rentals America.[26]

### e.   Communications Between Tyler Cook and Credit Reporting Agencies.

In September 2017, Cook retained the services of a credit repair agency to prepare a series of credit reporting dispute letters that were sent to the three credit bureaus.[27] The first letter prepared by the credit repair agency was dated October 31, 2017 and the last letter was dated February 12, 2018.[28]

### f.   MACU's Responses Through e-OSCAR.

MACU received several Automated Consumer Dispute Verifications ("ACDVs") from the credit bureaus concerning MACU's reporting of the Debt via "e-OSCAR."[29] Before MACU transmitted its respective responses through e-OSCAR, MACU employees thoroughly reviewed the Cook account, and verified that all information transmitted to the credit bureaus was accurate.[30]

### i.   Cook's Credit History.

In October 2017, according to Cook, the main factors affecting his credit were the repossession and also the collections account.[31]  Cook's credit score in February 2013 was 668.[32] Cook's credit score in October 2017 was 527.[33] In October 2017, Cook had at least nine negative trade line items showing up on his credit report.[34] Cook's credit reports indicate a long history of credit mismanagement.[35]  Cook admits he does not

---

[26] See **Exhibit A**, Exhibit 7, MACU 01390-01397.
[27] See **Exhibit A**, Pgs. 82:13-85:24.
[28] See **Exhibit A**, Pg. 99:21-25, Exhibit 9.
[29] See **Exhibit G**, ¶ 27-28; See **Exhibit B**, Pg. 10-11.
[30] See **Exhibit G**, ¶ 30.
[31] See **Exhibit A**, Pg. 54:4-9.
[32] See **Exhibit A**, Pg. 21:12-14.
[33] See **Exhibit A**, Pg. 47:5-9.
[34] See **Exhibit A**, Pg. 47:10-15.
[35] See **Exhibit B**, Pg. 18.

know how MACU's credit reporting affected his credit score.[36] Cook's expert admits he does not know how MACU's credit reporting affected Cook's credit score.[37]

## III.   LEGAL STANDARD.

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. Proc. 56(a). On an issue as to which the nonmoving party will have the burden of proof, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. *Id.* Conclusory, speculative testimony in affidavits or moving papers is insufficient to raise genuine issues of fact defeating summary judgment. *See Nelson v. Pima Community College,* 83 F.3d 1075, 1081-82 (9th Cir. 1996); *Thornhill Pub. Co., Inc. v. GTE Corp.,* 594 F.2d 730, 748 (9th Cir. 1979).

## IV. ARGUMENT.

### a.   Overview of Pertinent Provisions of Fair Credit Reporting Act.

Congress enacted the Fair Credit Reporting Act ("FCRA") in 1970 "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Gorman v. Wolpoff & Abramson, LLP,* 584 F.3d 1147, 1153 (9th Cir. 2009).

Many provisions of the FCRA only apply to "credit reporting agencies" ("CRAs"). MACU is a "furnisher" *not* a CRA. The requirements of "furnishers" are set for the in § 1681s-2 and include two general categories. First, § 1681s-2(a) imposes requirements on a "furnisher" "to provide accurate information." However, consumers like Cook cannot maintain a private action for violation of § 1681s-2(a). *Gorman,* 584 F.3d at 1014. Second, § 1681s-2(b) requires a "furnisher" to "conduct an investigation"

---

[36] See **Exhibit A**, Pg. 62:3-5.
[37] See **Exhibit D**, Pgs. 91:1-4, 93:16-20, 150:16-21.

with respect to disputed information sent from a CRA.  Therefore, § 1681s-2(b) is the only FCRA provision that is applicable to MACU in this suit.

Obligations under § 1681s-2(b) arise only after the furnisher receives notice of dispute from a CRA - notice of a dispute received directly from the consumer does not trigger a furnisher's duties under § 1681s-2(b). *Gorman,* 584 F.3d at 1154.

§ 1681s-2(b) provides that, after receiving a notice of dispute, the furnisher shall: (A) Conduct an investigation with respect to the disputed information; (B) Review all relevant information provided by the CRA pursuant to § 1681i(a)(2); (C) Report the results of the investigation to the CRA; (D) If the investigation finds that the information is incomplete or inaccurate, report those results to all other CRAs to which the person furnished the information; and (E) If an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), modify, delete or permanently block the reporting of that item of information to the CRAs.

### b.  MACU's Reporting Is Accurate.

Factually, there is no dispute that the information MACU reported to the CRAs was accurate.  This was confirmed by MACU's credit reporting expert and even Cook's expert agrees. [38]

At first blush it may seem that "accuracy" is irrelevant to a § 1681s-2(b) claim, as this provision deals with a furnisher's investigation and does not mention "accuracy" (unlike § 1681s-2(a) which does).  However, "accuracy" is relevant to a claim under §1681s-2(b) because an investigation that results in the furnisher verifying *accurate* information about the debt is necessarily "reasonable" for purposes of §1681s-2(b). *Chiang v. Verizon New England Inc.,* 595 F.3d 26, 29-30 (1st Cir. 2010) ("a § 1681s-2(b) claim requires plaintiff to show actual inaccuracies that a furnisher's objectively

---

[38] See **Exhibit B**, pg. 13; See Rebuttal Expert Report of John Ulzheimer, attached as **Exhibit C,** pg. 3; See **Exhibit D**, Pgs. 62:10-69:3, 168:4-24.

reasonable investigation would have been able to discover"). In this sense, proving "accuracy" is an absolute defense. *Id.; see also DeAndrade v. Trans Union LLC,* 523 F.3d 61, 67 (1st Cir. 2008) (consumer bringing claim under different provision of the FCRA - § 1681i(a) – must prove that the reported information was in fact inaccurate); *Kuehling v. Trans Union LLC,* 137 Fed.Appx. 904, 908 (7th Cir. 1991) ("Without evidence of some inaccuracy in the … report or reinvestigation, Kuehling cannot establish that Trans Union violated the FCRA – either § 1681e(b) or §1681(a)(1)(A)"); *Cahlin v. Gen. Motors Acceptance Corp.,* 936 F.2d 1151, 1160 (11th Cir. 1991) (the determinative question for liability was whether the credit reporting agency could have discovered an error in a particular report through a reasonable investigation); *Dennis v. BEH-1, LLC,* 520 F.3d 1066 (9th Cir. 2008) (holding that plaintiff suing under the FCRA must make a "prima facie showing of inaccurate reporting"); *Carvalho v. Equifax Info. Servs., LLC,* 629 F.3d 876, 890 (9th Cir. 2010) ("Although the FCRA's reinvestigation provision … does not on its face require an actual inaccuracy exist for a plaintiff to state a claim, many courts, including our own, have imposed such a requirement"); *Spence v. TRW, Inc.,* 92 F.3d 380, 382 (6th Cir. 1996) ("a showing of inaccuracy is an essential element of a claim under the Fair Credit Reporting Act").

Stated differently – Cook cannot prove that MACU's investigation was "unreasonable" if Cook cannot also prove "some causal relationship between the furnisher's unreasonable investigation and the failure to discover inaccuracies in his account." *Gustafson v. Experian Information Solutions, Inc.,* 2015 WL 3477071 (C.D. Cal. June 2, 2015) (citing *Chiang,* supra).

Reporting is "accurate" for purposes of the FCRA as long as it is technically accurate, or accurate on its face. *Dickens v. Trans Union Corp.,* 18 Fed.Appx. 315, 318 (6th Cir. 2001). Here, MACU disclosed all the Metro codes transmitted to the credit

bureaus from September 2017 to August 2018.[39]  Both retained experts in this case examined these reports and both experts confirmed that there was nothing inaccurate about the codes transmitted.[40]  Mr. Ulzheimer concluded:  "This information as reported by MACU, as reported through these codes, was accurate."[41]  Moreover, during the deposition of Cook's retained expert – Thomas Tarter – each specific item was reviewed and to each item Cook's expert agreed there was nothing inaccurate about the information.[42]

Not only did Cook's expert confirm the information was accurate, Cook's expert actually admitted that no additional information, including other fields, should have been populated or transmitted.[43]  Stated differently – the information was accurate, and even Cook's expert admits that there was nothing else MACU could have done to make the reporting *more* accurate.

Given these admissions, it is worth wondering what triggered Cook to file this lawsuit in the first place.  As best as MACU can understand, Cook's grievance is that MACU *and* Financial Assistance (as a third party debt collector) were both reporting the Debt.  However, this grievance does not amount to a cause of action under the FCRA for several reasons.  First, the balances of third party collections are not considered in FICO scoring systems.[44]  Therefore, Cook's primary argument that the two balances – added together - somehow harm his credit score is simply false.

Second, as confirmed by MACU's credit reporting expert, "it is common in the industry for original creditors, like MACU, to continue reporting to the credit reporting

---

[39] See **Exhibit G**, ¶ 19.
[40] See **Exhibit B**, Pg. 12-13.; **Exhibit D**, Pgs. 62:10-69:3, 168:4-24.
[41] See **Exhibit B**, Pg. 13.
[42] See **Exhibit D**, Pgs. 62:10-69:3, 168:4-24.
[43] See **Exhibit D**, Pgs. 68:24-69:3.
[44] See **Exhibit B**, Pg. 18.

agencies even after they have assigned a debt to a third party debt collector."[45]   The Consumer Data Industry Association ("CDIA") – the trade association of the credit reporting industry – *agrees* that "it is appropriate to continue reporting … accounts that are being worked by a third party collection agency.   While this may appear as double reporting to the consumer, you have the obligation as the data furnisher to accurately report the account standing with your organization.   You should not stop reporting on your account."[46]   The CDIA further confirmed that "…if you report the balance as zero, it would appear the consumer no longer has an obligation to make payments to you" so "you should continue reporting the Current Balance and as funds are collected on your behalf report the declining balance."[47]

In Cook's expert's report, he was unable to point to *one single* industry standard to support his "double reporting" theory.   When questioned about this during his deposition, Mr. Tarter claimed there was an "absolute standard" in the credit reporting industry of "one debt, one tradeline."[48]   However, when asked if this "absolute standard" had ever been reduced to writing, he testified that "I have not seen it."[49]

In fact, Mr. Tarter has tried to present similar opinions about "double reporting" in other cases that were flat out rejected.   In *Gustafson v. Experian Information Solutions, Inc.,* the *Gustafson* court dismissed the "double reporting" claim and further stated:  "Gustafson points to the declaration of her expert witness, Thomas A. Tarter, for the proposition that double-reporting falls beneath the industry standard."   The *Gustfson* court did not consider Mr. Tarter's opinion because "conclusory expert assertions cannot

---

[45] See **Exhibit C**, Pg. 5.
[46] See **Exhibit C,** Pg. 6; **Exhibit E** (MACU 1487-1488).
[47] See Updated Response from CDIA, dated May 7, 2019, attached as **Exhibit E**.  The updated response was received after the discovery deadline in this case, but the original response was disclosed as MACU 1487-1488.
[48] See **Exhibit D**, Pg. 46:14-23.
[49] See **Exhibit D**, Pg. 46:14-23.

raise trial issues of material fact on summary judgment." *Gustafson v. Experian Information Solutions, Inc.,* 2015 WL 3477071 (C.D. Cal. June 2, 2015).  Mr. Tarter admitted that since *Gustafson* he could not recall testifying in any other cases about "double reporting."[50]

Third, to the extent there is something improper about "double reporting," there was no "double reporting" in this case.   MACU did not furnish a duplicate account to the credit bureaus.[51]  MACU furnished a single loan record or "tradeline" to the credit bureaus and at no time did they ever report a second loan record or "tradeline" to any of the credit bureaus.[52]  As explained by Mr. Ulzheimer, the "duplicate account moniker as it pertains to credit reporting is appropriate only when the furnisher of information, like MACU, furnishes the same account more than one time, thus causing it to show up more than one time on a consumer's credit report. **MACU did not and never reported the loan more than once to the credit reporting agencies.** If it had, the Plaintiff would have had two separate MACU loans appearing on his credit reports, which he never did."[53]  (Emphasis added.)

### c.  MACU Conducted a "Reasonable" Investigation.

Assuming this Court determines that MACU's credit reporting was accurate, the inquiry ends there and summary judgment is appropriate.  However, even assuming this Court determines that MACU's credit reporting was somehow inaccurate, there is no liability if MACU nonetheless conducted a "reasonable" investigation.  *Gorman,* 584 F.3d at 1157.  Again, Cook cannot maintain a private cause of action under § 1681s-2(a). *Gorman,* 584 F.3d at 1014.

---

[50] See **Exhibit D**, Pg. 42:20-25.
[51] See **Exhibit G**, ¶ 18; **Exhibit B**, Pg. 12.
[52] See **Exhibit G**, ¶ 18; **Exhibit B**, Pg. 12.
[53] See **Exhibit B**, Pg. 14.

The burden of showing that a furnisher's investigation was "unreasonable" is on the plaintiff. *Id.* at 1157. The "pertinent question is thus whether the furnisher's procedures were reasonable in light of what it learned about the nature of the dispute from the description in the CRA's notice of dispute." 584 F.3d at 1157. Importantly, the law ***does not require*** a furnisher to investigate further than what is described in the notice of dispute. *Id.* at 1157.

Determining that the furnisher's investigation was reasonable, the *Gorman* court did an extensive analysis of the three separate disputes received by the furnisher. *Id.* at 1157-1161. After reviewing the content of these disputes, the *Gorman* court found that summary judgment was appropriate because the furnisher could not have reasonably been expected to undertake a more thorough investigation based upon the limited information contained in the notice of dispute. *Id.* at 1158.

Similarly, in *Westra v. Credit Control of Pinellas,* the 7th Circuit Court of Appeals determined that "given the scant information" the furnisher received regarding the nature of the dispute, the furnisher's investigation was "reasonable" even if the furnisher could have taken other actions to learn more about the dispute. 409 F.3d 825, 827 (7th Cir. 2005) (affirming summary judgment in favor of furnisher). In *Westra,* the furnisher was not required to contact the customer directly because "requiring a furnisher to automatically contact every consumer who disputes a debt would be terribly inefficient and such action is not mandated by the FCRA." *Id.*

In *Gustafson v. Experian Information Solutions, Inc.* – which is also a case that deals with alleged "double reporting" - a California district court determined that nothing about the notices would have identified a need to "look back and forth" at both accounts because the notices provided no suggestion of the nature of the borrower's dispute with the other tradeline. *Gustafson v. Experian Information Solutions, Inc.,* 2015 WL 3477071 (C.D. Cal. June 2, 2015).

Here, Mr. Ulzheimer concluded that "the dispute resolution process performed by MACU was normal and reasonable and it resulted in continued accurate credit reporting of the Plaintiff's repossession."[54]   MACU employees reviewed the disputed information and verified that it was accurate.[55]   Specifically, MACU employees Cathy Bates and Rene Canizalez took the following steps:[56] First, they confirmed Cook's information, including his name, address, and social security number.   Second, they reviewed Loan ID to confirm the date the account was opened, the loan amount and the current status of the account.   Third, they read through the entire collection package to verify the dates that the account became delinquent, confirmed the balance owing, and also confirmed the collection actions.   Fourth, they verified in the comments of the collection package the date that the obligation was internally charged off and sent to a third-party collector for collection.   Fifth, they verified the reporting dates to confirm that they matched to what MACU was reporting.   Finally, if they had discovered discrepancies they would have made appropriate changes.   However, concerning their review of the Cook account as outlined above, they did not discover any discrepancies.[57]

Even to the extent this Court determines that something should have been done about the so-called "double reporting" (which, to date, Cook has failed to explain what) there is no liability because nothing in Cook's written disputes say anything about "double reporting."[58]   For example, in the October 31, 2017 written dispute, Cook mentioned "errors" with the "payment history."[59]   However, when asked about this during his deposition, Cook said "maybe I was thinking that I had made payments that

---

[54] See **Exhibit B**, Pg. 14.
[55] See **Exhibit G**, ¶¶ 29-30.
[56] See **Exhibit G**, ¶¶ 28-30.
[57] See **Exhibit G**, ¶ 30.
[58] See **Exhibit A**, Pgs. 86:17-99:25.
[59] See **Exhibit A**, Exhibit 9.

were not on there.  I'm not sure.  I don't remember."[60]  Similarly, Cook complained the MACU account had been "sold", but when asked about this during his deposition Cook admitted that he had not reviewed "any records, document" or had any conversations with anyone that lead him to believe that it was "sold."[61]  As a factual matter, the account has never been "sold."[62]  When asked further, Cook said the only reason he thought the MACU account was "sold" was because of something he "read online."[63]

### d. Mountain America Could Not "Modify, Delete or Permanently Block" The Trade Line.

Even after full discovery, which included written discovery, deposing Cook and even deposing Cook's expert, it is still unclear what specific action Cook was hoping MACU would take to resolve the so-called "inaccurate" reporting.  § 1681s-2(b)(1)(E) states that in the event inaccurate information is found, the appropriate steps would be to: (i) modify that item of information, (ii) delete that item of information, or (iii) permanently block the reporting of that item of information.

Here, deleting the trade line or reporting a "$0.00" balance would be inaccurate and therefore (ii) is inapplicable.  MACU still owns the Debt, and Cook still owes the Debt.[64]  Indeed, the CDIA confirmed that "if you report the balance as zero, it would appear the consumer no longer has an obligation to make payments to you" so "you should continue reporting the Current Balance and as funds are collected on your behalf report the declining balance."[65]  For essentially the same reasons, it would not be appropriate for MACU to "permanently" block the reporting so (iii) is inapplicable.

---

[60] See **Exhibit A**, Pg. 91:5-7.
[61] See **Exhibit A**, Pg. 92:14-17.
[62] See **Exhibit F**, Exhibit 1; **Exhibit G**, ¶ 15.
[63] See **Exhibit A**, Pg. 103:20-104:5.
[64]  See **Exhibit F**, Exhibit 1; **Exhibit G**, ¶ 15.
[65] See **Exhibit E**, Updated Response from CDIA, dated May 7, 2019.

Finally, with respect to (i), Cook has failed to explain what MACU could have done to "modify" the "item of information" to make it accurate. All of the information that MACU reported was accurate (supra). Cook's expert was even asked directly "was there something else that should have been transmitted in the form of Metro language, any other fields that should have been populated" and his response was "no."[66]

### e. MACU's Reporting Did Not Cause Damages.

In order to make a claim for negligent noncompliance of the FCRA, including § 1681s-2(b), a plaintiff must establish actual damages. 15 U.S.C. § 1681o(a)(1); *see also Banga v. Experian Information Solutions, Inc.,* 473 Fed.Appx. 699, 700 (9th Cir. 2012). Where a plaintiff fails to meet his burden of showing actual damages caused by a FCRA violation, summary judgment is appropriate. *See Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1161 (11th Cir. 1991) (affirming grant of summary judgment on FCRA claim because the plaintiff failed to meet his burden "of coming forward with evidence supporting his claim that [defendant's] alleged inaccurate report caused him harm"); *Birmingham v. Equifax, Inc.*, No. 2:06-cv-00702, 2009 WL 194985, *2 (D. Utah Jan. 26, 2009) (stating that Plaintiff's FCRA claims "fail as a matter of law because Plaintiff has failed to provide evidence (a) that he suffered any damages or (b) that [Defendant] caused his alleged damages.")

The only document disclosed to support any "damages" resulting from any credit reporting is the Rentals America letter denying Cook's application.[67] First, this is inadmissible hearsay. Second, the denial letter itself confirms that Cook was not denied because of any so-called "double reporting." Instead, he was denied because he "… has more than $2,500 outstanding debt" and "[he] has more than 5 outstanding collections."[68] Third, notwithstanding the denial letter from Rentals America, Cook was

---

[66] See **Exhibit D**, Pgs. 68:24-69:3.
[67] See **Exhibit A**, Exhibit 6, MACU 1331.
[68] See **Exhibit A**, Exhibit 6, MACU 1331.

actually *approved* by another company the same month and found a rental property that was *larger* than the Rentals America property.[69]

The truth is that Cook had very poor credit in October 2017 and his own expert admits that.[70]   Cook himself admits that the main factors affecting his credit were the repossession and also the various collections accounts.[71]   His credit score went from 668 in 2013 to 527 in October 2017.[72]   There were countless negative and derogatory items in the various credit reports disclosed.[73]

Even to the extent this Court finds evidence of "damages," Cook cannot prove that MACU's reporting *caused* those damages.   This is because Cook and his expert both admit that they do not know how the various negative items affected Cook's credit score.[74]   As Mr. Ulzheimer points out in his report, the documents indicate Cook "was not denied credit or housing as a result of MACU."[75]

Finally, even to the extent Cook can support some damages caused by MACU, there is an absolute cut-off date of November 7, 2017, because this is the *first* dispute that MACU received concerning the account.[76]   *Chase,* 282 F.3d at 1059-60 (duties arise *only* after the furnisher receives notice of dispute from a CRA).

### f.   There Is No Evidence Of "Willful" Noncompliance And Therefore Summary Judgment As To § 1681n Is Appropriate.

Given that Cook has not sustained any actual damages from MACU's credit reporting, Cook must prove that the violation was "willful." *Birmingham v. Experian*

---

[69] See **Exhibit A**, Exhibit 7, MACU 01390-01397.
[70] See **Exhibit A,** Pgs. 54:4-9, 21:12-14, 47:5-25, 62:3-5.; **Exhibit D,** Pgs. 81:22-25, 82:2-3, 91:1-4, 93:16-20, 150:16-21.; See **Exhibit C**, Pg. 18.
[71] See **Exhibit A**, Pg. 54:4-9.
[72] See **Exhibit A,** Pgs. 21:12-14, 47:5-9.
[73]  See **Exhibit A,** Pg. 47:10-25; **Exhibit B**, Pg. 18.
[74] See **Exhibit A**, Pg. 62:3-5; **Exhibit D**, Pgs. 91:1-4, 93:16-20, 150:16-21.
[75] See **Exhibit B**, Pg. 16.
[76] See **Exhibit G**, ¶ 28.

*Info. Solutions, Inc.,* 633 F.3d 1006, 1009 (10th Cir. 2011) (under § 1681n(a) the consumer need not prove actual damages if the violation is willful).

As explained in the seminal US Supreme Court case *Safeco Ins. Co. of Am. v. Burr,* a "willful" violation is either an intentional violation or a violation committed in "reckless disregard" of statutory duty.   551 U.S. 47, 56 (2007).   Recklessness is measured by "an objective standard: action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known."  *Id.* at 68.  "[A] company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless."  *Id.* at 69.

A defendant's conduct is reckless only if it was "objectively unreasonable" in light of "legal rules that were 'clearly established' at the time."  *Id.* at 69-70.  *Safeco* held that a violation does not cross the "willfulness" threshold just because a defendant's interpretation of the FCRA is erroneous; it must instead be "objectively unreasonable." *Long v. Tommy Hilfiger U.S.A.,* 671 F.3d 371, 377 (3rd Cir. 2012) (finding objectively reasonable standard not met); *Fuges v. Sw. Fin. Svcs., Ltd.,* 707 F.3d 241 (3rd Cir. 2012).

Here, there is no evidence of any "willful" violations.  Indeed, MACU reported the way it did – i.e. reporting the balance owing – because that is the most accurate way to present the information.  The fact that Mr. Ulzheimer – an expert in the credit reporting field and cited by Cook's own expert - found nothing wrong with MACU's reporting proves (at the very least) that MACU had a good faith basis to believe its reporting was accurate and FCRA compliant.

**V. CONCLUSION.**

For these reasons, or any other reasons this Court deems just and proper, MACU requests this Court to enter summary judgment in its favor on all claims.

Dated: May 24, 2019                    HOUSER & ALLISON,

                                       A Professional Corporation

                                       /s/ Solomon S. Krotzer
                                       Robert W. Norman
                                       Solomon S. Krotzer
                                       Attorneys for Defendant Mountain
                                       America Federal Credit Union


## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of May 2019, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing, with a transmittal of a Notice of Electronic Filing to CM/ECF Registrants.

David A. Chami
Price Law Group APC
8245 N. 85th Way
Scottsdale, AZ 85258
david@pricelawgroup.com
Attorneys for Tyler Cook


s/ Paige Kleinwolterink
Paige Kleinwolterink