WO                    IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Tyler Cook,                                )
                                       )
                   Plaintiff,     )
                                       )
      vs.                             )
                                       )
Mountain America Federal Credit Union;  )
Experian Information Solutions, Inc.; Equifax  )
Information Services, LLC; and TransUnion,  )
LLC,                                )
                                     )     No. 2:18-cv-1548-HRH
                    Defendants.  )
_____)

O R D E R

Cross-motions for Summary Judgment

Plaintiff moves for partial summary judgment.[1]   This motion is opposed,[2] and defendant cross-moves for summary judgment.[3] Defendant's cross-motion is opposed.[4] Oral argument was requested and has been heard.

_____

[1]Docket No. 98.

[2]Docket No. 101.

[3]Docket No. 99.

[4]Docket No. 100.

<u>Facts</u>

Plaintiff is Tyler Cook.  Defendant is Mountain America Federal Credit Union.

In 2013, plaintiff purchased a vehicle which was financed by defendant.  In 2015, plaintiff fell behind on his payments and the vehicle was repossessed and sold at auction.  There was a deficiency balance of $13,651.53.  In December 2015, defendant turned plaintiff's account over to Financial Assistance, Inc. (FAI) for collection.

Both defendant and FAI reported the deficiency balance to credit reporting agencies (CRAs).[5]  FAI's contract with defendant authorized FAI to report an assigned debt after 60 days.[6]

In October of 2017, plaintiff began applying for rental properties because he and his wife had recently sold their home.  Plaintiff and his wife applied for a rental property with Lotus Real Estate on October 3, 2017.[7]  Lotus Real Estate stated that "[b]ased on their income and other factors, we would have no problem approving them."[8]  Plaintiff and his wife also applied for a rental with Waypoint but did not pursue that application because the rental agent told plaintiff that "[t]hings that result in a denial are bankruptcies, foreclosures,

---

[5]Defendant reported the debt at $13,651 and FAI reported it as $13,652.

[6]30(b)(6) Deposition of Mountain America Credit Union (by Woody Woodruff) at 18:18-25, Exhibit O, Declaration of David A. Chami, which is appended to Plaintiff's Motion for Partial Summary Judgment, Docket No. 98-21.

[7]Exhibit 4 at MACU 01285, Deposition of Tyler Cook, Exhibit A, Defendant's Motion for Summary Judgment, Docket No. 99-1.

[8]<u>Id.</u>

monies owed to properties, felonies, judgments, evictions, repossessions, [and a] large amount of account[s] in collections."[9]

On October 25, 2017, plaintiff's rental application with Rentals America was declined based on his credit.[10]  More specifically, plaintiff's application was declined because he had "more than $2500 [in] outstanding debt" and "more than 5 outstanding collections[.]"[11]

Plaintiff's FICO score in October 2017 was 527 and his credit report included "9 potentially negative items."[12]  Two of these potentially negative items were FAI's tradeline and defendant's tradeline.[13]  FAI's tradeline listed the account as a "collection account," the status as "In Collections," and the current balance as $13,652.[14]  Defendant's tradeline listed the account as an "installment account," the status as "Charged Off," and the balance as $13,651.[15]  There were also four other "charged off" accounts listed and three other "in

---

[9]Exhibit 5 at MACU 01403, Cook Deposition, Exhibit A, Defendant's Response to Plaintiff's Motion for Partial Summary Judgment, Docket No. 101-1.

[10]Exhibit J at MACU 01340, Chami Declaration, which is appended to Plaintiff's Motion for Partial Summary Judgment, Docket No. 98-16.

[11]Exhibit 6 at MACU 01331, Cook Deposition, Exhibit A, Defendant's Response to Plaintiff's Motion for Partial Summary Judgment, Docket No. 101-1.

[12]Exhibit K at MACU 01312, Chami Declaration, which is appended to Plaintiff's Motion for Partial Summary Judgment, Docket No. 98-17.

[13]Id.  A credit report tradeline is an industry term to describe a credit account.

[14]Id.

[15]Id.

collections" accounts.[16]   The total past due amount listed on plaintiff's credit report was $30,228, which did not include both the $13,651 being reported by defendant and the $13,652 being reported by FAI.[17]   Only the $13,652 was included in the total past due amount.  In the credit and collection history portion of his credit report, FAI was listed as a creditor of a "collection account" that had been originally defendant's account and there was a notation that this was a deficiency after a repossession.[18]   There was also a notation that this was a "seriously past due" account that had been "assigned to attorney/collection agency or credit grantor's internal collection department."[19]   Defendant was listed as a creditor of an "installment account" that had been "charged off" and there was a notation that this was for an "auto loan" and that the "unpaid balance was reported as a loss by [the] credit grantor[.]"[20]

On October 26, 2017, plaintiff and his wife signed a one-year lease with Peace Properties.[21]   Plaintiff and his family moved out of this property before the lease expired and moved in his father.

---

[16]Id.

[17]Id.

[18]Id. at MACU 01314.

[19]Id.

[20]Id. at MACU 01315-16.

[21]Exhibit 7 at MACU 01390, Cook Deposition, Exhibit A, Defendant's Motion for Summary Judgment, Docket No. 99-1.

On October 31, 2017, plaintiff sent letters to TransUnion, Experian, and Equifax, disputing how the deficiency balance was being reported.  Plaintiff testified that he hired a credit repair agency to assist him with these letters.[22]  As to the FAI account, plaintiff stated that "[t]he information [being reported] is minimal; there is no first Delinquency or Date of Last Activity even reported.  I believe the account is being re-aged and needs to be removed."[23]  As to defendant's account, plaintiff stated that his credit report

> shows [this] account was "transferred or sold."  If an account is SOLD and the creditor no longer owns it, . . . it cannot be reported as a collectible debt.  In addition to the Balance amount, there are other errors I see in the account reporting, such as the Date of Last Activity and the Payment History. Please DELETE any Balance and correct the other issues on the account immediately or delete it entirely.[[24]]

On November 30, 2017,[25] plaintiff wrote directly to defendant to dispute how the deficiency balance was being reported.  Plaintiff stated that defendant was "reporting that this account was 'Sold'" and asked how defendant could be reporting the account if it had been

---

[22]Cook Deposition at 82:23-83:5, Exhibit A, Defendant's Motion for Summary Judgment, Docket No. 99-1.

[23]Exhibit 9 at Cook000086, Cook000101-102, Cook Deposition, Exhibit A, Defendant's Response to Plaintiff's Motion for Partial Summary Judgment, Docket No. 101-1.

[24]Id.

[25]Plaintiff also apparently sent a letter directly to defendant on January 2, 2018, which defendant received on January 10, 2018.  Exhibit J at 3, Defendant's Response to Plaintiff's Motion for Partial Summary Judgment, Docket No. 101-10.  But defendant contends that this "letter was not signed and had no indication of who sent the letter."  Id.

sold.[26]  Plaintiff also requested that defendant provide him with proof that defendant was accurately reporting his account, in the form of his actual payment history and a copy of his original loan agreement.[27]  Plaintiff stated that "[a] reply from you [defendant] simply stating the account is being reported correctly, <u>without</u> the proof above is NOT sufficient under the law.  Reporting a 'Sold Account' with a collectible balance is already non-compliant with the law."[28]  Defendant did not reply to this letter.

Defendant did, however, receive "several Automated Consumer Dispute Verifications ('ACDVs') from the credit bureaus concerning [its] reporting of" plaintiff's account "via a web-based system called Online Solution for Complete and Accurate Reporting or 'e-OSCAR[]."[29]  Defendant provided responses to the ACDVs via e-OSCAR after it had "thoroughly reviewed the Cook account, and verified that all information transmitted to the credit bureaus was accurate."[30]

On November 30, 2017, plaintiff again sent letters to TransUnion, Experian, and Equifax, stating that he did not believe that FAI's and defendant's tradelines were "being

---

[26]Exhibit N, Chami Declaration, which is appended to Plaintiff's Motion for Partial Summary Judgment, Docket No. 98-20.

[27]<u>Id.</u>

[28]<u>Id.</u>

[29]Declaration of Catherine Bates in Support of Motion for Summary Judgment at 4, ¶ 27, Exhibit G, Defendant's Motion for Summary Judgment, Docket No. 99-7.

[30]<u>Id.</u> at 7, ¶ 29.

reported legally."[31]   Plaintiff asked TransUnion and Experian to "explain to me HOW you conducted your investigation:  who you talked to at [FAI and defendant], copies of email[s,] communications, copies of documents reviewed and any data provided, such as date of the first delinquency."[32]  Because plaintiff had not received a reply from Equifax to his original letter, he advised Equifax that "[it] must be that the information I disputed was either inaccurate, or it could not be verified so it needs to be deleted."[33]

On January 2, 2018, plaintiff wrote to TransUnion and Equifax again.  As to the FAI account, plaintiff again complained that the "information [being] report[ed] is minimal; there is no Date of first Delinquency or Date of Last Activity even reported.  I believe this account is being re-aged and needs to be removed."[34]  As to defendant's account, plaintiff stated that he had not received a response to his November letter and he requested a response in the next 15 days or he would "immediately file a CFPB complaint."[35]

On January 2, 2018, plaintiff also wrote to defendant again, requesting that defendant provide his payment history and a copy of the original loan agreement in order to validate the

---

[31]Exhibit 9 at Cook000133, Cook00002, Cook Deposition, Exhibit A, Defendant's Motion for Summary Judgment, Docket No. 99-1.

[32]Id.

[33]Id. at Cook000092.

[34]Id. at Cook000100, Cook000143.

[35]Id.

debt.[36]  Plaintiff wrote that "[i]f I do not receive absolute proof from you within 15 days, you must delete this account from my credit file or be prepared to face legal action."[37]

On February 12, 2018, plaintiff wrote to Equifax and TransUnion once more, this time advising them that after he received their responses to his dispute letters, he contacted defendant directly to ask defendant "to verify the negative listing."[38]  Plaintiff advised that defendant had not responded to his request and that he felt that defendant was violating the Fair Credit Reporting Act.[39]

Plaintiff avers that "[d]ue to the duplicative reporting on my credit report, I have been denied credit for the purchase of a new home."[40]  Plaintiff also avers that "[a]s a result of these denial[s] and our inability to find a home to rent, my wife and I spent considerable time without a home and were forced to live [with] my father 60 miles from my place of employment."[41]  Plaintiff avers that "[t]his was humiliating to me and my family and caused

---

[36]Exhibit 10 at Cook000147, Cook Deposition, Exhibit A, Defendant's Motion for Summary Judgment, Docket No. 99-1.

[37]Id.

[38]Exhibit 9 at Cook000144, Cook 00010, Cook Deposition, Exhibit A, Defendant's Motion for Summary Judgment, Docket No. 99-1.

[39]Id.

[40]Declaration of Tyler Cook at 3, ¶ 16, which is appended to Plaintiff's Motion for Partial Summary Judgment, Docket No. 98.

[41]Id. at ¶ 17.

-8-

a great deal of stress in my marriage" and "has caused me to suffer extreme emotional distress as well as many sleepless nights."[42]

Plaintiff commenced this action on May 22, 2018. In his amended complaint, plaintiff asserts a single cause of action against defendant, a claim that defendant violated Section 1681s-2(b) of the Fair Credit Reporting Act (FCRA). Plaintiff seeks actual, statutory, and punitive damages.

Plaintiff now moves for summary judgment on the issues of liability and willfulness. Defendant cross-moves for summary judgment dismissing plaintiff's FCRA claim.

<u>Discussion</u>

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The initial burden is on the moving party to show that there is an absence of genuine issues of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, then the non-moving party must set forth specific facts showing that there is a genuine issue for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986). In deciding a motion for summary judgment, the court views the evidence of the non-movant in the light most favorable to that party, and all justifiable inferences are also to be drawn in its favor. <u>Id.</u> at 255. "'[T]he court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual

---

[42]<u>Id.</u> at ¶¶ 18, 20.

facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence.'" <u>Arandell Corp. v. Centerpoint Energy Services, Inc.</u>, 900 F.3d 623, 628–29 (9th Cir. 2018) (quoting <u>T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 631 (9th Cir. 1987)).

The FCRA was enacted "'to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy.'" <u>Gorman v. Wolpoff & Abramson, LLP</u>, 584 F.3d 1147, 1153 (9th Cir. 2009) (quoting <u>Safeco Ins. Co. of Am. v. Burr</u>, 551 U.S. 47, 52 (2007)).  "[T]he FCRA imposes some duties on the sources that provide credit information to CRAs, called 'furnishers' in the statute." <u>Id.</u>  Defendant is a furnisher.

"Section 1681s–2 [of the FCRA] sets forth '[r]esponsibilities of furnishers of information to consumer reporting agencies,' delineating two categories of responsibilities." <u>Id.</u> at 1154.  Plaintiff's claim is based on subsection 2(b).

> Subsection 1681s–2(b) provides that, after receiving a notice of dispute from a CRA, the furnisher shall:
>
> > "(A) conduct an investigation with respect to the disputed information;
> >
> > (B) review all relevant information provided by the [CRA] pursuant to section 1681i(a)(2) . . . ;
> >
> > (C) report the results of the investigation to the [CRA];
> >
> > (D) if the investigation finds that the information is incomplete or inaccurate, report those results to

> all other [CRAs] to which the person furnished
> the information . . . ; and
>
> (E) if an item of information disputed by a con-
> sumer is found to be inaccurate or incomplete or
> cannot be verified after any reinvestigation under
> paragraph (1) . . . (i) modify . . . (ii) delete[or] (iii)
> permanently block the reporting of that item of
> information [to the CRAs]."

Id. (quoting 15 U.S.C. § 1681s–2(b)(1)).  "These duties arise only after the furnisher receives

notice of dispute from a CRA; notice of a dispute received directly from the consumer does

not trigger furnishers' duties under subsection (b)."  Id.  "The FCRA expressly creates a

private right of action for willful or negligent noncompliance" with these requirements.  Id.

> A claim under 15 U.S.C. § 1681s–2(b) requires a plaintiff "to
> plead the following four elements to state a claim against a
> credit furnisher: (1) a credit reporting inaccuracy existed on
> plaintiff's credit report; (2) plaintiff notified the consumer
> reporting agency that plaintiff disputed the reporting as inaccu-
> rate; (3) the consumer reporting agency notified the furnisher of
> the alleged inaccurate information of the dispute; and (4) the
> furnisher failed to investigate the inaccuracies or further failed
> to comply with the requirements in 15 U.S.C.
> 1681s–2(b)(1)(A)–(E).

Heras v. Nelnet, Inc., Case No. CV 16–6388 FMO (PLAx), 2017 WL 4586334, at *5 (C.D.

Cal. April 28, 2017) (quoting Moses v. Experian Info. Sols., Inc., 2016 WL 3670068, *2

(N.D. Cal. 2016)).  There is no dispute here as to elements two and three.  The dispute here

focuses on elements one and four.

As to the first element, "'[a]n item on a credit report can be . . . inaccurate . . .

because it is patently incorrect, or because it is misleading in such a way and to such an

extent that it can be expected to adversely affect credit decisions.'" Drew v. Equifax Information Services, LLC, 690 F.3d 1100, 1108 (9th Cir. 2012) (quoting Carvalho v. Equifax Info. Svcs., LLC, 629 F.3d 876, 890 (9th Cir. 2010)).  Other circuits have held "that a § 1681s–2(b) claim requires [a] plaintiff to show actual inaccuracies that a furnisher's objectively reasonable investigation would have been able to discover." Chiang v. Verizon New England Inc., 595 F.3d 26, 29–30 (1st Cir. 2010) (emphasis added).  But, in the Ninth Circuit, "a consumer report that contains technically accurate information may be deemed 'inaccurate' if the statement is presented in such a way that it creates a misleading impression." Gorman, 584 F.3d at 1163 (citation omitted).

Defendant argues that its reporting was accurate.  As explained by defendant's expert, defendant reported plaintiff's information to the CRAs "using a language called 'Metro.' Metro, now Metro-2, is the credit industry standard reporting language."[43]  Using the Metro language and codes, defendant reported the following:

> the Account Status field was reported with code "97." Code 97 indicates the account is charged off.  The Portfolio Type field was reported with code "I." Code I indicates the account is an installment account.  The Account Type field was reported as "00."  The 00 code indicates the account is an auto loan.  The Payment History field was reported with code "L."  Code L indicates the loan was charged off previously.  The Special Comment Code was reported with code "BK."  Code BK indicates "Involuntary repossession with a balance owing."  The Date of 1st Delinquency was reported with the date "04_15_2015."  The ECOA field was reported with code "1."

---

[43]Expert Report of John Ulzheimer at 12, Exhibit L, Chami Declaration, which is appended to Plaintiff's Motion for Partial Summary Judgment, Docket No. 98-18.

> Code 1 indicates the account was an "individual" account,
> meaning only the Plaintiff was liable for the debt associated
> with the subject MACU loan.[44]

Both defendant's expert[45] and plaintiff's expert[46] have confirmed that this information was accurate.

But even if defendant's reporting was technically accurate, which it may have been, plaintiff argues that it was inaccurate for purposes of the FCRA because it was misleading. Plaintiff contends that defendant's reporting was misleading because both defendant and FAI, at the express direction of defendant, were reporting a balance due. Plaintiff contends that this double reporting increased the number of derogatory accounts as well as the amount of total debt on his credit report. Plaintiff argues that this double reporting created the impression that he had two debts totaling $27,303, rather than a single debt of $13,651. Plaintiff argues that because most credit decisions are the result of automated processes, both defendant's and FAI tradelines would have been interpreted as a negative item on his credit report, and not as a single negative item.

Plaintiff relies on the testimony of his expert, Thomas Tarter, for support of his argument that this type of "double reporting" is inaccurate in that it is misleading in such a way that it could be expected to adversely affect credit decisions. Tarter opined that

---

[44]Id. at 13.

[45]Id.

[46]Expert Deposition of Thomas Anthony Tarter at 62:10-69:3, Exhibit D, Defendant's Response to Plaintiff's Motion for Partial Summary Judgment, Docket No. 101-4.

"[e]ffectively duplicate negative reporting results in creating the illusion that a person's credit is worse than what it should be such as distorting the amount owed, amplifying the debt to available credit ratio, and the debt to income ratio."[47]   Tarter opined that

> that [d]efendants duplicate negative reporting created a 'double whammy' giving the illusion [plaintiff] had two large charge offs from two different creditors that approximated $13,000. To me, that is just not fair, reasonable and/or equitable nor is it consistent with credit industry standards.[[48]]

Defendant's expert disagrees.   Ulzheimer, defendant's expert, opines that "it is common and standard for original creditors, like [defendant], to continue reporting to the credit reporting agencies even after they have assigned a debt to a 3rd party debt collector."[49]  Defendant contends that plaintiff has no authority to support his double reporting theory.[50]  Defendant acknowledges that Tarter opined that "there is an absolute standard in the credit reporting industry, 'One debt, one tradeline.[']  In other words, each debt becomes reported

---

[47]Expert Report by Thomas Tarter at 26, Exhibit D, Chami Declaration, which is appended to Plaintiff's Motion for Partial Summary Judgment, Docket No. 98-7.

[48]Id. at 27-28.

[49]Rebuttal Report of John Ulzheimer at 5, Exhibit C, Defendant's Response to Plaintiff's Motion for Partial Summary Judgment, Docket No. 101-3.

[50]Defendant contends that Tarter's "double reporting" theory was rejected by the court in Gustafson v. Experian Information Solutions Inc., Case No. 2:14–cv–01453–ODW(Ex), 2015 WL 3477071 (C.D. Cal. June 2, 2015).  However, the court did not "flat out" reject Tarter's theory as defendant contends.  Rather, the court did not consider a declaration by Tarter because it contained "improper legal conclusions and fail[ed] to specify what information he relied on in reaching his conclusions."  Id. at *6.

as its own tradeline on a consumer's credit record, but double-reporting a single debt as two distinct tradelines is positively beneath industry standards."[51]  But, defendant argues that Tarter has no support for his contention that this is the industry standard.  When asked at his deposition whether this "absolute standard [had] ever been reduced to writing[,]" Tarter responded, "I have not seen it."[52]

Defendant also argues that this case does not involve "double reporting" as that term is understood in the credit reporting industry.  In his expert report, Ulzheimer states that "[t]he 'duplicate account' moniker, as it pertains to credit reporting is appropriate only when the furnisher of information . . . furnishes the same account more than one time, thus causing it to show up more than one time on a consumer's credit report."[53]  Defendant argues that if there had been "double reporting" in this case, then there would have been two MACU tradelines on plaintiff's credit report, which there is not.

Defendant insists that there is nothing misleading about both FAI and it reporting the deficiency balance.  Defendant's expert opined that the FAI "reporting clearly indicates that they are collecting a debt on behalf of [defendant] as a result of a deficiency balance from

_____

[51]Tarter Deposition at 46:14-20, Exhibit D, Defendant's Response to Plaintiff's Motion for Partial Summary Judgment, Docket No. 101-4.

[52]Id. at 46:21-25.

[53]Ulzheimer Expert Report at 14, Exhibit B, Defendant's Motion for Summary Judgment, Docket No. 99-2.

[p]laintiff's repossession."[54]  Thus, defendant argues that these two tradelines would not be interpreted as two separate debts, as plaintiff contends.

This is not a case of double reporting by a furnisher, but because the two tradelines reported a different balance for a different reason with a different account number, it is possible that someone reviewing plaintiff's credit report would interpret the two tradelines as reporting different debts.  This is partly due to the fact that while the FAI tradeline indicates that it is collecting a debt for defendant, it does not indicate that it is collecting <u>the</u> debt, i.e., the deficiency balance.  And, while defendant's expert opined that "no competent lender would be misled by [defendant's] credit reporting as being an incremental debt or that [p]laintiff is somehow liable for the same debt twice,"[55] it is not always "competent lenders" who are making credit decisions.

Defendant relies on the answers to emails it received from the Metro 2 Task Force in support of its argument that its reporting was compliant with industry standards and thereby could not be considered misleading.  This reliance is misplaced.  Defendant

asked  the CDIA's[56] Metro 2 Task Force, "if an account is sent

---

[54]Ulzheimer Expert Report at 14, Exhibit L, Chami Declaration, which is appended to Plaintiff's Motion for Partial Summary Judgment, Docket No. 98-18.

[55]<u>Id.</u>

[56]The CDIA is the Consumer Data Industry Association, which "is the trade association of the credit reporting industry.  They are also responsible for maintaining the credit reporting industry standards, the Metro 2 credit reporting language, and making changes to the reporting standards and Metro 2 if warranted."  Ulzheimer Rebuttal Expert
(continued...)

> to a 3rd party collection agency, but the balance remains due to our (MACU) financial institution, is it appropriate for us to report the account to the CRA's alongside the 3rd party collector?  Currently we are reporting account status 93 when we send (an account) to a 3rd party for collections.  However, we have received complaints that the collection agency is reporting the balance as well, which results in the same balance being reported twice on the consumer's credit."[57]

Status 93 is "Account seriously past due/Account assigned to attorney, collection agency or credit grantor's internal collection department[.]"

> The response from the CDIA was, "It is appropriate to continue reporting Account Status 93 on accounts that are being worked by a 3rd party collection agency.  While this may appear as double reporting to the consumer, you have an obligation as the data furnisher to accurately report the account standing with your organization.  You should not stop reporting on your account."[[58]]

After receiving this response, defendant asked the CDIA Metro Task Force a follow-up question: "if the account is sent to a 3rd party collection agency, but the balance remains due to our financial institution, and we continue to report to the CRA's along with the 3rd party collector, should our tradeline show that the current balance and amount past due is zero?"[59]

---

[56](...continued)
Report at 6, Exhibit P, Chami Declaration, which is appended to Plaintiff's Motion for Partial Summary Judgment, Docket No. 98-22.

[57]Id. at 5-6.

[58]Id. at 6.

[59]Exhibit E at 5, Defendant's Response to Plaintiff's Motion for Partial Summary Judgment, Docket No. 101-5.

The CDIA responded that "[y]ou should continue reporting the Current Balance and as funds are collected on your behalf report the declining balance.  If you report the balance as zero, it would appear the consumer no longer has an obligation to make payments to you. Additionally reporting Account Status 93 with a zero Current Balance and Amount Past Due would be illogical."[60]

In these emails, defendant was asking about reporting balances as "Status 93" when plaintiff's deficiency balance was being reported by defendant as "Status 97."  Thus, these emails have nothing to do with whether defendant's reporting of plaintiff's debt complied with industry standards.

Similarly, plaintiff's reliance on FAQ No. 46 is misplaced.  FAQ No. 46 asks: "How should accounts that have been transferred be reported?"[61]  In response, two options for reporting transferred accounts were given, one of which "results in two tradelines on a consumer's file:  the first as transferred and the second for the ongoing account."[62]  But, FAQ No. 46 explained that under this option, the current balance for the "transferred account" should be zero.[63]  However, FAQ No. 46 states that these two options are "for reporting

_____

[60]Id. at 1.

[61]Exhibit C at MACU 00568, Chami Declaration, which is appended to Plaintiff's Motion for Partial Summary Judgment, Docket No. 98-5.

[62]Id.

[63]Id.

accounts that are being transferred internally or to a servicer[.]"[64]  Here, defendant "did not

transfer [p]laintiff's loan internally to another department within MACU" nor did it "transfer

[p]laintiff's loan to a loan servicer.  [Rather, it] assigned [p]laintiff's debt to a 3rd party debt

collect[or]."[65]  FAQ No. 46 has no application here.

Defendant argues that even if it were not industry standard for both FAI and defendant

to report the deficiency balance, its reporting could not be considered misleading because its

reporting could not have been "expected to have an adverse effect" on any credit decision.

First, defendant argues that the two balances being reported by defendant and FAI would not

create an impression that plaintiff owed more than he did because "[t]he balances of 3rd party

collections are not considered in FICO® credit scoring systems."[66]  Ulzheimer opined that

"any value residing in the balance field of a 3rd party collection account is immaterial to a

consumer's credit score" which means that "the balance associated" with FAI's "credit

reporting had no impact on [p]laintiff's credit scores because it is not a scored value."[67]

But, plaintiff's expert opined that the "severity and amount of delinquencies are

significant factors in the computation of credit scores" and that "[i]n this case, the duplicate

---

[64]Id.

[65]Ulzheimer Rebuttal Report at 7, Exhibit C, Defendant's Response to Plaintiff's
Motion for Partial Summary Judgment, Docket No. 101-3.

[66]Ulzheimer Expert Report at 18, Exhibit B, Defendant's Motion for Summary
Judgment, Docket No. 99-2.

[67]Id. at 19.

negative reporting increased the amount of delinquency and the number of derogatory accounts thereby magnifying negative data reported to CRAs and later to authorized inquirers."[68]  And, as discussed above, competent lenders are not the only ones who make credit decisions based on an individual's credit report.  It is possible that someone without sufficient training or background would have read plaintiff's credit report to mean that he owed more than he did because there were discrepancies between FAI's and defendant's reporting of plaintiff's account.

Second, defendant argues that plaintiff has not come forward with any evidence that its reporting <u>actually</u> caused any adverse credit decisions.  But this argument goes to causation and damages, not to whether a report is misleading for purposes of the FCRA.  A report is misleading for purposes of the FCRA if "it can be <u>expected</u> to adversely affect credit decisions[.]'"  <u>Drew</u>, 690 F.3d at 1108 (quoting <u>Carvalho</u>, 629 F.3d at 890) (emphasis added).

In sum, there are material questions of fact as to whether defendant's reporting was misleading for purposes of the FCRA.

But even if there are questions of material fact as to element one of plaintiff's FCRA claim, which there are, defendant argues that it is still entitled to summary judgment because its investigation of plaintiff's dispute was reasonable.  "[A] furnisher's obligation to conduct a reasonable investigation under § 1681s–2(b)(1)(A) arises when it receives a notice of

---

[68]Tarter Expert Report at 24, Exhibit D, Plaintiff's Motion for Partial Summary Judgment, Docket No. 98-7.

dispute from a CRA." <u>Gorman</u>, 584 F.3d at 1157.  "The pertinent question is . . . whether the furnisher's procedures were reasonable in light of what it learned about the nature of the dispute from the description in the CRA's notice of dispute." <u>Id.</u>

Defendant argues that the investigation it did after receiving notice of the disputes from the CRAs was reasonable.  Catherine Bates, one of defendant's employees, avers that she

> performed the following steps [to investigate plaintiff's dispute]: First, I confirmed the member's (Tyler Cook) information, including name, address, and social security number.  Second, I reviewed [the] Loan ID to confirm the date the account was opened, the loan amount and the current status of the account. Third, I read through the entire collection package to verify the dates that the account became delinquent, confirmed the balance owing, and also confirmed the collection actions.  Fourth, I verified in the comments of the collection package the date that the obligation was internally charged off and sent to a third-party collector for collection.  Fifth, I verified the reporting dates to confirm that they matched to what MACU was report-ing.  Finally, if I had discovered discrepancies I would have made appropriate changes.  However, concerning my review of the Cook account as outlined above, I did not discover any discrepancies.[69]

Defendant argues that in light of the information that plaintiff provided in his dispute letters, this investigation was reasonable.  This was confirmed by defendant's expert.  Ulzheimer opined that "[t]he dispute resolution process performed by MACU was normal and reasonable and it resulted in continued accurate credit reporting of [p]laintiff's

---

[69]Bates Declaration at 7, ¶ 30, Exhibit G, Defendant's Motion for Summary Judgment, Docket No. 99-7.

repossession."[70]   Defendant argues that this is especially true here because nothing in plaintiff's written disputes said anything about "double reporting."   For example, in the October 31, 2017 letters to the CRAs, plaintiff complained about errors in the payment history and that if defendant had sold his account, it should not be reporting a balance due. But, plaintiff did not expressly state that he thought both FAI and defendant were reporting the same debt.

However, at her Rule 30(b)(6) deposition, Bates was questioned about plaintiff's November 30, 2017 dispute letter:

> Q:     So if you take a look at Exhibit 13 – that's Mr. Cook's dispute – you see he lists both [the] Financial Assistance account and then below that he lists the Mountain America account, what he's disputing.  Do you see that?
>
> A:     Yes, I do.
>
> Q:     You would have been aware, then, when you received that dispute that Financial Assistance was who was collecting on behalf of  Mountain America, would you not?
>
> A:     I do.
>
> Q:     Okay.  And you see that . . . under the Mountain America section of his dispute Mr. Cook is actually saying, Hey, they're reporting this as transferred or sold, and therefore they should delete the balance.  Do you see that's what he's asking for?
>
> A:     I do see that.
>
> Q:     Okay.  Would you have, as part of your investigation, confirmed whether or not Financial Assistance was actually collecting on the account?
>
> A.      I would.
>
> Q:     And would you have known at that time that they were

---

[70]Ulzheimer Expert Report at 14, Exhibit B, Defendant's Motion for Summary Judgment, Docket No. 99-2.

> also reporting the debt as well?
>
> A:      I would.
>
> Q:      Okay.  And you were aware, then, that what Mr. Cook
>         was asking was that basically both of you shouldn't be
>         reporting that balance and that . . . Mountain America
>         should delete it; right?
>
> A.      I am, yes.[71]

This evidence shows that defendant was aware that the nature of plaintiff's dispute was the double reporting of his deficiency balance.  Yet, all Bates did was look at the computer screen to confirm that the balance being reported was correct, "that the payment history [was] correct" and "the last date of payment. . . ."[72]  "By its ordinary meaning, an 'investigation' requires an inquiry likely to turn up information about the underlying facts and positions of the parties, not a cursory or sloppy review of the dispute."  Gorman, 584 F.3d at 1155.  A reasonable fact finder could conclude that defendant's investigation was cursory and thus not reasonable because it did not address plaintiff's claim that his account balance should not be reported by both FAI and defendant.

Nonetheless, defendant argues that its investigation could not be considered unreasonable because there was nothing it could have done about the alleged double reporting.  Defendant contends that the whole point of requiring a furnisher to conduct a reasonable investigation is so that it can correct any inaccurate or incorrect information.

---

[71]Rule 30(b)(6) Deposition of Catherine Bates at 20:5-21:9, Exhibit S, Chami Declaration, Plaintiff's Motion for Partial Summary Judgment, Docket No. 98-25.

[72]Deposition of Catherine Bates at 18:8-19:25, Exhibit A, Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant Mountina America Federal Credit Union's Motion for Summary Judgment, Docket No. 100.

Section 1681s-2(b) provides that if there is inaccurate information, a furnisher shall "(i) modify . . . (ii) delete[or] (iii) permanently block the reporting of that item of information [to the CRAs]." 15 U.S.C. § 1681s-2(b)(1)(E).   Defendant argues that deleting its tradeline would be inaccurate because plaintiff does, in fact, still owe defendant money.   Defendant also argues that it could not permanently block the reporting of this information because it still owns the debt and plaintiff still owes it money.   And, defendant contends that plaintiff has not explained how defendant could have modified the way in which it was reporting plaintiff's debt.

There may have been at least one way in which defendant could have modified the information it was reporting.   As discussed above, in the emails defendant sent to the Metro 2 Task Force, it indicated that it generally reported debts that had been assigned to a debt collector as "Status 93."   But, defendant was reporting plaintiff's debt as a "Status 97."   This may have made a difference in how the information appeared on plaintiff's credit report.

In sum, there are material questions of fact as to the reasonableness of defendant's investigation.

Defendant next argues that it is entitled to summary judgment on plaintiff's FCRA claim because plaintiff cannot prove any actual damages.   Actual damages are available under FCRA for negligent violations.   Syed v. M-I, LLC, 853 F.3d 492, 505 (9th Cir. 2017). Defendant contends that the only evidence suggesting that plaintiff suffered any harm as a result of defendant's reporting was the Rentals America letter denying plaintiff's application.

-24-

Plaintiff's application was denied because he had "more than $2500 [in] outstanding debt" and "more than 5 outstanding collections[,]"[73] which he would have had even if defendant had not been reporting the deficiency balance.  But more important, the credit history that Rentals America was relying on did not show the FAI account.  It only showed defendant's account as a collection account.[74]   And, the evidence shows that plaintiff and his wife signed a long-term lease the day after Rentals America denied plaintiff's rental application.

However, "a denial of credit is" not "a prerequisite to recovery under the FCRA." Guimond v. TransUnion Credit Information Co., 45 F.3d 1329, 1333 (9th Cir. 1995).  Actual damages "include recovery for emotional distress and humiliation."  Id.

Plaintiff testified at his deposition that defendant's credit reporting caused him emotional distress and that

> [i]t's all I think about.  I can't sleep.  The stress, it's always on my mind.  I can't sleep.  I'm always on edge.  I just don't know what to do.  I'm trying to take care of my family of five kids.  I was like stuck, didn't know what to do.  I had a plan of paying off my debts to help fix my credit, and that just really threw a wrench in it.[[75]]

There is at least a question of fact as to whether plaintiff suffered emotional distress because of defendant's reporting.

---

[73]Exhibit 9 at MACU 01331, Cook Deposition, Exhibit A, Defendant's Motion for Summary Judgment, Docket No. 99-1.

[74]Id. at MACU 01332-01335.

[75]Cook Deposition at 113:10-16, Exhibit U, Chami Deposition, which is appended to Plaintiff's Motion for Partial Summary Judgment, Docket No. 98-27.

Plaintiff argues that he is also entitled to statutory and punitive damages.  Statutory and punitive damages under the FCRA require a showing of willfulness.  <u>Syed</u>, 853 F.3d at 505.  "Under the FCRA, a plaintiff may demonstrate willfulness by showing a reckless disregard of statutory duty."  <u>Taylor v. First Advantage Background Services Corp.</u> 207 F. Supp. 3d 1095, 1101 (N.D. Cal. 2016).  "A defendant's conduct is reckless only if it was 'objectively unreasonable' in light of 'legal rules that were clearly established at the time.'" <u>Banga v. First USA, NA</u>, 29 F. Supp. 3d 1270, 1278 (N.D. Cal. 2014) (quoting <u>Safeco Insur. Co.</u>, 551 U.S. at 69-70).

Plaintiff has not shown that he is entitled to statutory and punitive damages.  No reasonable fact finder could conclude that defendant's conduct was willful.

Conclusion

Based on the foregoing, plaintiff's motion for partial summary judgment[76] is denied as is defendant's motion for summary judgment.[77]

DATED at Anchorage, Alaska, this 29th day of August, 2019.

/s/ H. Russel Holland
United States District Judge

---

[76]Docket No. 98.

[77]Docket No. 99.

-26-